47 F.3d 218
 148 L.R.R.M. (BNA) 2449, 129 Lab.Cas. P 11,287
 INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Heckett Multiserv Division of Harsco Corporation,
Intervening Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Heckett Multiserv Division of Harsco Corporation,
Intervening Petitioner,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150,
AFL-CIO, Respondent.
 Nos. 94-1583, 94-1848.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 10, 1994.
Decided Feb. 8, 1995.
 
 Louis E. Sigman, Dale D. Pierson (argued), Pasquale A. Fioretto, Brian C. Hlavin, Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, for International Union of Operating Engineers, Local 150, AFL-CIO.
 Elizabeth Kinney, Librado Arreola, N.L.R.B., Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben, Deborah E. Shrager (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Ellen A. Farrell, Corinna L. Metcalf, Injunction Litigation Branch, Marion L. Griffin, Contempt Litigation Branch, Washington, DC, for N.L.R.B.
 William Bevan, III, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Heckett Multiserv Div. of Harsco Corp.
 Before POSNER, Chief Judge, COFFIN* and BAUER, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 Local 150 of the International Union of Operating Engineers, AFL-CIO, seeks review of a decision by the National Labor Relations Board (Board) that the Union violated the secondary boycott provisions of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(b)(4)(i), (ii)(B). The Board, which cross-petitions for enforcement of its order, found that the Union, inter alia, picketed neutral gates at a multi-employer workplace in an effort to force the uninvolved employers to pressure the struck employer into settling the dispute more quickly. Having concluded that the Board's fact-finding is supported by substantial evidence and its legal conclusions are correct, we affirm its decision and grant the petition for enforcement.
 
 I.
 
 2
 LTV Steel operates a large steel making plant in East Chicago, Indiana. Located on the grounds of the 1,150-acre facility are two companies that serve as subcontractors to LTV for the processing and disposal of slag, a by-product of the steelmaking process. The strike at issue in this case was aimed at one of those companies, Edward C. Levy Co. (Levy), whose collective bargaining agreement with Local 150 expired at the end of September 1991. Employees of the other slag processing firm, the Heckett Division of Harsco Corp. (Heckett), also are represented by Local 150. Their contract expires in September 1995.
 
 
 3
 The LTV plant has three entrances, designated as the East Bridge gate, the West Bridge gate, and the Burma Road gate. The East and West Bridge gates are the entrances normally used for access to the facility by employees and vendors. The ALJ found that the Burma Road entrance is used only in strike situations, as part of a so-called "reserved gate" system. Such a system is common where employers share a site but only one is experiencing labor strife. See Mautz & Oren v. Teamsters Local No. 279, 882 F.2d 1117, 1122 (7th Cir.1989). One entrance is "reserved" for the exclusive use of traffic related to the struck firm, and all picketing must be directed there. This system is designed to keep neutral parties out of the dispute, and avoids the need for them to cross picket lines. Id.; Kinney v. International Union of Operating Engineers, Local 150, 994 F.2d 1271, 1273 (7th Cir.1993).
 
 
 4
 The strike against Levy began on October 12, 1991, and ended on October 18. On the first day of the strike, LTV posted signs at each of the three gates. All of them identified the East and West Bridge gates as "neutral" gates reserved for the use of LTV Steel and all persons having business with the company, except for anyone connected with Levy. The signs directed Levy's traffic to the Burma Road gate, "which has been reserved solely and exclusively for Levy's employees, their suppliers, their delivery men, their subcontractors and all others having business with Levy." LTV expected the Union to picket only at this gate.
 
 
 5
 It is undisputed that no one from LTV gave written notice, or any other formal notification, of the gate arrangement to the Union,[1] which established picket lines on public property near each of the three gates. The signs posted by LTV at the East and West Bridge gates could be seen by the picketers, but the words probably were not visible. Two company officials testified, however, that they told picketers at both the East and West Bridge locations on October 12 that a Levy gate had been set up at the Burma Road entrance and that the picketing should be confined to that location. An LTV security officer also testified that he informed four picketers near the East Bridge gate entrance that they would have to picket at Burma Road.[2]
 
 
 6
 The nature of Burma Road was given particular attention at the hearing before the ALJ, and continues to be a matter of some debate between the parties. The ALJ's summary of the testimony indicates that the road runs off of Front Street and that, where it intersects with Front, it is no more than a gravel road. See ALJ Opinion at 13 n. 9. Indeed, at the outset of the strike, the "road" was overgrown with weeds and difficult to make out. A paved road also runs off of Front Street alongside the graveled Burma Road. This road, which is gated, is used as an entrance to an Amoco Oil Company facility. A sign on the gate identifies the property behind it as belonging to Amoco and, at the time of the strike, another sign was posted there, stating: "Amoco Employees Only."
 
 
 7
 According to the ALJ, the gravel portion of Burma Road extends about 150 to 200 yards beyond the intersection with Front Road, where it becomes paved, apparently connecting with Amoco's road, and then continues on toward LTV's gate. On the other side of the gravel Burma Road are railroad tracks on property belonging to a company identified as EJ & E. Burma Road thus is a distinctly non-road-like path that lies between the Amoco Oil gate and the EJ & E property. A large pole placed there by Amoco usually blocks the entrance to Burma Road from Front Street, but this was removed at LTV's request during the strike. The truck traffic generated by Levy made the location of the road "obvious" as the strike progressed. ALJ Opinion at 13 n. 9.
 
 
 8
 Burma Road is central to this case because the Board maintains that, once the Levy reserved gate was established, the Union was legally permitted to picket only at that location. The Union claims that it not only received no notice of the reserved gate system, but also that it could not picket at the Burma Road gate because to do so would have required trespassing on Amoco's property. It contends that "Burma Road" is not a public thoroughfare, but simply a common name used for the paved roadway that begins at Front Street, on Amoco's property, and continues on the oil company's property for about a mile before reaching LTV's gate.
 
 
 9
 Also of significance is the role of Heckett's employees during the strike. Heckett and Levy are direct competitors and, consequently, there apparently was some concern on the part of the Union about whether LTV would look to Heckett for help during a strike by Levy.[3] See ALJ Opinion at 6-7 & n. 2, 22. Heckett's employees, meanwhile, were concerned about what the Union expected of them if a strike were called against Levy; their contract had a no-strike provision and they feared losing their jobs if they did not report to work. Id. at 8-9. According to the ALJ, Heckett employees' expressions of concern to the Union were met with "what at best can be termed a mixed message." Id. at 8.
 
 
 10
 Several Heckett employees testified that they were told either before the strike, or at its outset, that a neutral gate would be set up. Id. at 8-9. On two occasions, however, Union officials at least implicitly urged members to respect picket signs established at their worksite, thereby disdaining the reserved gate system. In a meeting held on October 10 at the Union's office, Recording Secretary Cisco told the membership that Levy had made a "1950s offer," and that there would be a strike. Id. at 9. He read from a card the following instructions for responding to a picket line:
 
 
 11
 Good union members respect picket lines. A good union member is extremely careful when confronted with a picket line situation. When a picket line is established on a job where he is working:
 
 
 12
 1. He leaves. He does not talk--just leaves.
 
 
 13
 2. He reads the picket sign as he leaves.
 
 
 14
 3. He does not hang around near the job.
 
 
 15
 4. He knows that once a picket line is established, his Business Agents and other Union officials are legally gagged and handcuffed from giving advice pertaining to that job. They can only tell him if the Picket Line is authorized.
 
 
 16
 5. He does not allow himself to be drawn into conversation with anyone at the job site.
 
 
 17
 Id. at 9-10.
 
 
 18
 Two days later, on the day the strike began, the Union's business representative gave the Union steward, a Heckett employee, about thirty copies of an information card to distribute to employees. The steward passed out some of the cards, and put the rest on tables in the Heckett locker room. These cards contained the five admonitions previously read to the Union members, as well as the following statement of rights:
 
 A Good Union Member knows his rights:
 
 19
 a. He has the right not to work behind any picket line.
 
 
 20
 b. He has the right to decide for himself whether to walk off a job being picketed.
 
 
 21
 c. He understands that his trade may be under attack next.
 
 
 22
 d. He knows that a two gate system means a picket line and he has the right not to work, no matter how many gates the employer sets up.
 
 
 23
 Id. at 10.
 
 
 24
 About 53 of the 69 Union members employed by Heckett worked during the strike. On October 14, during the strike, the Union filed internal charges against them for "refus[ing] to honor the picket line," in violation of the Union's by-laws. On a petition from the Board's regional director, the district court enjoined the Union from engaging in proceedings to discipline these employees, and this court affirmed. See Kinney, 994 F.2d at 1273. See also infra at n. 5.
 
 
 25
 In the decision now on appeal, the Board found that various of the Union's actions constituted unfair labor practices under the NLRA: (1) picketing at neutral gates; (2) distributing pamphlets encouraging employees of neutral employers to stay out of work; (3) bringing internal charges against members employed by a neutral employer; and (4) applying to employees of a neutral employer the Union bylaw barring members from working on a job where a strike has been called.[4]
 
 
 26
 The Union challenges only the finding that it violated the NLRA by picketing at the East and West Bridge gates. Accordingly, the Board's order with respect to the remaining issues, which is supported by the ALJ's comprehensive findings, is enforced. See, e.g., U.S. Marine Corp. v. NLRB, 944 F.2d 1305, 1314 (7th Cir.1991) (en banc); NLRB v. Jakel Motors, Inc., 875 F.2d 644, 645 (7th Cir.1989).[5]
 
 II.
 
 27
 The legal framework for reviewing an NLRB decision is set by statute, see 29 U.S.C. Sec. 160(e), (f), and this court has described it often:
 
 
 28
 Our task is to determine if the judgment of the NLRB is supported by substantial evidence on the record as [a] whole. We must defer to the expertise of the Board and will not displace its reasonable inferences even where a plenary review of the record might yield a different result. Moreover, we "must accept the Board's credibility findings unless the party challenging [those determinations] establishes [that] 'exceptional circumstances' " justify a different result.
 
 
 29
 Jakel Motors, 875 F.2d at 646 (quoting NLRB v. Dorothy Shamrock Coal Co., 833 F.2d 1263, 1265 (7th Cir.1987)); see also, e.g., NLRB v. WFMT, 997 F.2d 269, 274 (7th Cir.1993).
 
 
 30
 The question before us, therefore, is whether substantial evidence in the record supports the Board's finding that the Union's picketing ran afoul of the NLRA's secondary boycott provisions.[6] Union conduct violates section 8(b)(4) of the NLRA "if any object of that activity is to exert improper influence on secondary or neutral parties," Local Union No. 501 v. NLRB, 756 F.2d 888, 892 (D.C.Cir.1985) (emphasis in original). Whether the Union was motivated by a secondary objective is a question of fact, NLRB v. Chauffeurs, Teamsters, Warehousemen, 773 F.2d 921, 923 (7th Cir.1985), and is to be determined through examination of "the 'totality of [the] union's conduct in [the] given situation.' " NLRB v. Local 307, Plumbers, etc., 469 F.2d 403, 408 (7th Cir.1972). See also Mautz & Oren, 882 F.2d at 1121.
 
 
 31
 Because not all union conduct that interferes with uninvolved employers is banned, the distinction between permissible "primary" activity and unlawful "secondary" activity "is often 'more nice than obvious,' " Local Union No. 501, 756 F.2d at 892 (quoting Local 761, Elec. Workers v. NLRB (General Elec.), 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961)). This is particularly true where the primary and secondary employers occupy a common work site. As an evidentiary tool for determining the dispositive point--the union's intent--the NLRB has adopted the so-called Moore Dry Dock standards. Mautz & Oren, 882 F.2d at 1121 (citing Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547, 549 (1950)). Under these standards, a union's picketing is presumed to be lawful primary activity if (1) it is "strictly limited to times when the situs of the dispute is located on the secondary employer's premises"; (2) "the primary employer is engaged in its normal business at the situs"; (3) it is "limited to places reasonably close to the location of the situs"; and (4) it "discloses clearly that the dispute is with the primary employer." Id.
 
 
 32
 The third standard is the one of significance in this case. When an employer implements a valid reserved gate system, and a union continues to picket a gate designated exclusively for neutrals, a violation of the third Dry Dock criterion is established because the picketing is not limited to the "location" of the dispute as permissibly confined. Id. at 1122 & n. 3 (citing Supreme Court approval of "the use of separate gates to cabin a labor dispute at a multi-employer work site"). This gives rise to a presumption of illegitimate, secondary intent. Local Union No. 501, 756 F.2d at 893. The question remains, however, "a factual inquiry into the union's actual state of mind under the totality of the circumstances." Mautz & Oren, 882 F.2d at 1121.
 
 III.
 
 33
 Under these standards, we have little difficulty affirming the Board's determination that the Union violated section 8(b)(4) by intentionally enmeshing neutrals in its dispute with Levy. The ALJ's most crucial finding, that the Union knew about the reserved gate system, yet "consciously chose" to ignore it, ALJ Opinion at 26, is amply supported by the record. The evidence recounted by the ALJ showed that Union officials anticipated the establishment of a reserved gate system and had indicated to some Heckett employees that the Union itself was working toward setting up a safe gate. In addition, Union officials knew that Levy was using the Burma Road entrance, and it is undisputed that that gate was used only during strikes as part of a reserved gate system. Thus, the fact that the Union sent pickets to Burma Road by itself reflects knowledge that a reserved gate system was in place. Moreover, while the wording on the signs posted at the East and West Bridge gates may not have been visible to picketers and supervising Union officials, they certainly could see that signs had been posted and so must have realized that the anticipated reserved gates had been designated. Indeed, LTV officials testified that they told Union members at both the East and West Bridge gates to move to the Levy gate at Burma Road.[7]
 
 
 34
 The Union contends that, in the absence of formal notice of a reserved gate system, it may not be penalized for failing to confine its picketing to the Burma Road location. We acknowledge that it would be better if employers gave written or other formal notice of such a system, even when it appears that the Union must have gained actual knowledge through an informal method. In these circumstances, however, we cannot say that the ALJ improperly imposed responsibility on the Union based, among other factors, on its having received sufficient notice of the system. Cf. Soft Drink Workers Union Local 812 v. NLRB, 657 F.2d 1252, 1261-62 (D.C.Cir.1980) ("[T]he Board [was] entitled to use simple logic to infer an object of the union's conduct from the practical realities of the situation.").
 
 
 35
 Moreover, misuse of the reserved gate system was not the only evidence of the Union's intent to engage in secondary activity. As the Board found, the Union unlawfully distributed pamphlets to Heckett employees advising them that they had the right not to work "no matter how many gates the employer sets up." In addition, on the first day of the strike, a picketer who identified himself as picket captain, told LTV's labor relations manager that a Union official had directed that all three gates be picketed and that the Union's "intent was to impact not only Levy employees but Heckett employees, iron workers and other employees."[8] This intent also was reflected in statements made by Union official Cisco at a November meeting, in which he suggested that the strike would have been shorter if the Heckett employees had not crossed the picket line. Finally, the fact that the Union brought charges against those employees for crossing the line lends further support to the finding of a secondary objective.
 
 
 36
 The Union makes one other challenge to the Board's ruling, arguing that the decision incorrectly relies on an assumption that its members had access to LTV's Burma Road gate. The Union maintains that that entrance, which was a good distance down Burma Road from Front Street, could be reached only by trespassing on Amoco's property. The Union claims that it therefore may not be faulted for failing to confirm the existence of the reserved gate by seeing the sign posted there, nor could it have been expected to limit its picketing to the Burma Road gate because pickets could not have been posted there without breaking the law.
 
 
 37
 This reliance on Burma Road's status as private property is flawed in several respects. First, and most importantly, the ALJ's finding that the graveled or grassy entrance to Burma Road off of Front Street provided permissible, apparently public, access to LTV's gate is supported by substantial evidence. That entry was used in past labor disputes, including one involving Local 150, and the Union knew that all of Levy's traffic was entering LTV by means of Burma Road during this strike. Nothing in the record suggests an adverse response by Amoco to that arrangement and, indeed, there was uncontradicted evidence that Amoco agreed to remove the pole that usually blocked the road to facilitate its use as part of the reserved gate system.[9]
 
 
 38
 Second, the ALJ's finding that the Union avoided gaining direct knowledge of the reserved gate system by picketing at the Front Street entrance to Burma Road, rather than down the road at the LTV gate, was simply one of several indications of the Union's deliberate ignorance. Even if the Union did have a good faith belief that its members should not use Burma Road, the ALJ's ultimate decision would remain supported. As noted earlier, the simple fact that pickets were sent to Burma Road, in light of the past practice with respect to that gate, indicates an awareness of the system.
 
 
 39
 Finally, debating the ownership of Burma Road in the face of undisputed evidence that it had been used as a reserved gate in the past strikes us as no more than a disingenuous attempt to discredit the ALJ's permissible inference that the Union refused to enter Burma Road specifically to avoid the sign it knew was posted on the gate. The Union points to nothing in the record that would validate its asserted concern about the use of the gravel path to reach the LTV gate.
 
 
 40
 In sum, we believe the ALJ permissibly found that the Union received adequate notice of a validly established reserved gate system, and "chose to ignore it," ALJ Opinion at 25. This conclusion, particularly when taken together with the Union's distribution of leaflets encouraging Heckett employees to honor the picket line, the disciplinary action against the 53 employees who did work, and the statements made by Union representatives, provides more than substantial evidence to support the Board's determination that Local 150's picketing activity was intended to implicate secondary parties and thus was unlawful under section 8(b)(4).
 
 
 41
 The Union's petition for review is therefore denied, and the Board's cross-application for enforcement of its order is granted.
 
 
 
 *
 The Honorable Frank M. Coffin of the First Circuit is sitting by designation
 
 
 [1]
 LTV's manager of labor relations testified that Levy managers said that they had told the Union about the reserved gate system, and this was one reason he did not give direct notice
 
 
 [2]
 The Burma Road gate was at some distance down the road from where the Burma Road picketers stood, and the sign posted there could not have been seen from their location
 
 
 [3]
 During a 1983 strike by Local 150 against Heckett, some of Heckett's work was performed by a competitor using Union employees
 
 
 [4]
 The Board issued a brief order in which it affirmed virtually all of the ALJ's rulings, findings and conclusions, and adopted the judge's recommended order
 
 
 [5]
 Counsel stated at oral argument that issues concerning the discipline of the 53 Heckett employees have been resolved consistently with the Board's ruling
 
 
 [6]
 Section 8(b)(4) of the Act, 29 U.S.C. Sec. 158(b)(4), provides, in pertinent part, that it shall be an unfair labor practice for a union or its agents:
 (i) to engage in, or to induce or encourage any individual employed by any person ... to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or
 (ii) to threaten, coerce, or restrain any person ... where in either case an object thereof is
 (B) forcing or requiring any person ... to cease doing business with any other person ...: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing....
 
 
 [7]
 In its order, the Board stated that it need not decide whether the Union had received notice of the reserved gate system from its picketing employees and picket captain. The other facts, however, render compelling the ALJ's observation that "it defies common sense that picketers are told by LTV Steel officials to move to another gate and refuse to do so without discussing the matter with their Union representatives." See ALJ Opinion at 18. See also id. at 25 ("It is disingenuous for [the Union officials who were monitoring the picket lines] to suggest that the only topic not discussed was the establishment of a reserve gate system.")
 The ALJ explicitly credited the LTV officials' testimony concerning their conversations with the picketers, and found the Union witnesses to be unbelievable, see id. at 18, or vague, id. at 14. See also id. at 9 ("I find Connors [the union's financial secretary and a picket monitor] to be an evasive witness with a very selective memory.... [M]uch of [his] testimony was disingenuous and lacking in candor.").
 
 
 [8]
 The Union makes much of the Board's reliance on this statement, arguing that it is contrary to ordinary principles of agency to impute intent to the Union based on a single picketer's statement. The argument is far overstated. The ALJ simply included this statement as one piece of evidence of the Union's impermissible secondary intent. Even without it, substantial evidence supported the Board's finding of a violation. Moreover, whether or not this statement was sufficient to bind the Union as a matter of agency law, it was certainly a relevant and appropriate consideration in a "totality of the circumstances" inquiry into the Union's intent
 
 
 [9]
 The fact that Amoco may have placed a pole over an area the ALJ found to be public property does not indicate that the ALJ was incorrect. Because the record suggests that there was no regular use of Burma Road except during labor disputes at the LTV facility, Amoco's effort to discourage entry into the area in all likelihood went unchallenged without regard to ownership of the property