**KIM'S TRUCKING COMPANY, INC., Plaintiff,**

v.

**GENERAL CHAUFFEURS, SALES, DRIVERS AND HELPERS LOCAL 179, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendant.**

No. 97 C 5980.

United States District Court, N.D. Illinois, Eastern Division.

May 14, 1998.

dismiss CB's motion to compel production of documents from McDonald's as moot.

James D. Jacobson, James E. Mahoney, Griffith & Jacobson, Chicago, IL, for Plaintiff.

Roger N. Gold, I. Peter Polansky, John Theodore Cichon, Brian M. Fern, Gold & Polansky, Chtd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Now before us is the defendant union's ("Local 179's") motion for summary judg-

ment on plaintiff Kim's Trucking ("Kim's") claim of a violation of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B). For the reasons stated below, we grant the motion.

## I. Background

Gallagher Asphalt ("Gallagher"), a paving company, hired Kim's to haul asphalt and other materials to and away from its road construction sites. The master collective bargaining agreement (known as an "Area Construction Agreement" or "ACA") to which Gallagher was a party required that any covered work it subcontracted be performed by a company which abided by the ACA's wage terms, which specified that asphalt hauling drivers were to receive $22.20 per work hour and time and a half for overtime. Kim's did not meet these requirements: it paid $16.64 per hour and no overtime bonus.

Local 179, another ACA signatory, complained to Gallagher in May, 1997, about this violation of the ACA, though the parties disagree about the substance of that complaint. Kim's claims that Local 179's president told Gallagher's vice president that Gallagher could not use Kim's and that if it did Gallagher would be picketed.[1] Local 179 denies that any threat was made. In any event, Local 179 filed a grievance with the ACA's grievance committee, and the committee ordered Gallagher to comply with the ACA.

Gallagher chose instead to continue to subcontract work to Kim's, and Kim's performed work on Gallagher's sites during the summer of 1997. On August 19, 1997, after learning that Kim's was still paying less than the area standards established by the ACA, a Local 179 official established a one-man picket line in front of two of Kim's trucks at the Galla-

gher construction site. His picket sign read: "NOTICE TO THE PUBLIC / KIM'S TRUCKING / PAYS ITS EMPLOYEES / SUBSTANDARD WAGES / AND BENEFITS / TEAMSTERS LOCAL 179 I.B. OF T." The construction worker responsible for accepting asphalt from the trucks, a member of another union, honored the picket and shut down the paving equipment. The Local 179 official stopped his activities immediately after Kim's trucks left the site, and the paving work resumed.

The Kim's trucks returned later that morning, spurring the same sequence of events. After this second incident, Gallagher's vice president directed a Local 179 member who worked for another company to drive one of Kim's trucks. The member left, however, after the Local 179 official told him that he would be subject to union charges for crossing a picket line. Kim's truck was driven away, the picketing again ceased, and the work by the other subcontractors again resumed.

## II. Discussion

 Believing that Local 179 had committed unfair labor practices, Kim's filed suit under 29 U.S.C. § 158(b)(4)(B), which prohibits a union from engaging in secondary activity. *See Landgrebe Motor Transport, Inc. v. District 72, International Ass'n of Machinists & Aerospace Workers, AFL–CIO,* 763 F.2d 241, 244 (7th Cir.1985). A union may not apply "economic pressure to a person with whom the union has no dispute ... in order to induce that person to cease doing business with, and thereby increase the pressure on, another employer, called the primary employer, with whom the union does have such a dispute." *Id.* Kim's, the primary employer,[2] complains of two secondary acts:

---

1. Local 179 appears to believe that the alleged threat was that Local 179 would picket Kim's, not Gallagher, and it notes that Kim's brief states just that. *See* Def.'s Reply at 12 & n. 7 (quoting Pl.'s Resp. at 5 ("There is, at a minimum, a dispute as to whether Local 179 threatened *to picket Kim's* ....")). This is not what is stated by the affidavit on which Kim's relies, however, which makes clear that the alleged threat was against Gallagher. *See* Pl.'s 12N Stmt.App. 8 (Aff. of Gallagher vice president), at ¶ 6 ("He told me that we could not use ... Kim's and that if

we did *we* would be picketed.") (emphasis added).

2. Local 179 does, of course, have a dispute with Gallagher, which subcontracted work in apparent violation of the ACA. But it also has a dispute with Kim's: the picketing of a non-unionized employer to protect area standards negotiated with other employers is a lawful activity. *See International Longshoremen's Local 1416, AFL–CIO v. Ariadne Shipping Co.,* 397 U.S. 195, 200–01, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970); *Giant Food Markets, Inc. v. NLRB,* 633 F.2d 18, 23 & n.

(1) the threat by Local 179's president that Gallagher would be picketed if it continued to subcontract work to Kim's; and (2) the picket by a Local 179 official at the Gallagher construction site.[3]

■ As we observed above, Local 179 denies that its president made a threat to Gallagher in May, 1997; it also challenges Kim's evidentiary basis for making that claim. Even giving Kim's the benefit of both of those doubts, however, the alleged threat does not amount to an unfair labor practice. Local 179 had a legitimate dispute with Gallagher, whose use of Kim's trucks (at least arguably) violated the ACA, making Gallagher a primary employer also. The warning by Local 179's president that a continuing violation of the collective bargaining agreement would be met with picketing is protected, not prohibited, conduct under the labor laws, see *NLRB v. Servette, Inc.*, 377 U.S. 46, 57, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), as § 158(b)(4)(B) does not bar picketing against primary employers. Moreover, even if we were wrong to find that the Gallagher vice president's affidavit only testified to a threat of a picket against Gallagher rather than against Kim's, see *supra* n. 1, correcting that error would not change our analysis: a union may inform a secondary employer (Gallagher) of or even "threaten" a secondary employer with its plan to picket a primary employer (Kim's) without violating § 158(b)(4). See *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 555 (9th Cir.1988).

■ The second alleged secondary act was Local 179's one-man picket at the Gallagher work site. Whether secondary motives were behind the union's action is a question of fact, which we determine using the four-part test of *Sailors' Union of the Pacific (Moore Dry Dock Co.)*, 92 N.L.R.B. 547, 549 (1950). See *International Union of Operating Engineers, Local 150, AFL-CIO v. NLRB*, 47 F.3d 218, 223 (7th Cir.1995). Under that test, "a union's picketing is pre-

sumed to be lawful primary activity if (1) it is 'strictly limited to times when the situs of the dispute is located on the secondary employer's premises'; (2) 'the primary employer is engaged in its normal business at the situs'; (3) it is 'limited to places reasonably close to the location of the situs'; and (4) it 'discloses clearly that the dispute is with the primary employer.'" *Id.* (quoting *Moore Dry Dock*, 92 N.L.R.B. at 549).

Under these principles, Local 179's picket was a textbook example of a proper picket of a primary employer. The undisputed facts are that (1) Local 179 conducted the picket only when Kim's trucks were in the asphalt line on the Gallagher construction site; (2) Kim's trucks were engaged in their normal business of hauling and dumping asphalt at the time of the picket; (3) the picketing only took place in the immediate vicinity of Kim's trucks; and (4) the sign carried by the Local 179 official disclosed clearly that the union's dispute was with Kim's. Nothing about Local 179's picketing raises any inference that it had secondary motives.

■ Kim's only objection to this analysis is that Local 179's picket was not a valid area standards picket in the first place. Kim's has presented evidence that five signatories to the ACA did not pay the wages specified therein in 1997, and it claims that the ACA's wage provisions are "[f]ictitious and [a]rtificially [h]igh."Pl.'s Resp. at 6. Local 179 argues that it is not clear that each of the signatories cited by Kim's were actually performing work covered by the ACA, and it counters with a list of companies which do comply with the ACA's wage provisions. Local 179 also submitted evidence that it filed a grievance against two of the five companies listed by Kim's upon learning of the substandard wages paid at those companies, and it reports that the companies have agreed to pay ACA-level wages.

The basis for the parties' disagreement is the Sixth Circuit's decision in *NLRB v. Great*

---

11 (6th Cir.1980). This makes Kim's a primary target of the union's protests rather than a secondary one.

**3.** We do not separately address the union official's threat of discipline against the union mem-

ber for crossing a picket line to work for Kim's, as the legality of this threat turns on the legality of the strike itself. See generally *Maritime Overseas Corp. v. NLRB*, 955 F.2d 212, 222 (4th Cir.1992).

*Scot, Inc.,* 39 F.3d 678 (6th Cir.1994). There the court held that the union has a "heavy burden" when engaging in area standards picketing—"that of establishing that its claims of substandard wages and benefits are made in good faith and are based on actual knowledge of conditions existing at the time the picketing is initiated against the targeted employer." *Id.* at 683 (footnotes omitted). We have no doubt that Local 179 has carried this burden. Even viewing all of the facts in the light most favorable to Kim's, the undisputed evidence shows that the ACA established area wages; that the wages paid by Kim's were less than the area standard wages; that Local 179 had actual knowledge of this disparity (the Local 179 official who conducted the one-man picket had earlier spoken to several Kim's drivers and received pay documentation from one); and that Local 179 had knew of the disparity at the time of the picketing. The fact that a few other hauling companies also paid less than the area standard wages shows nothing. There is no evidence that Local 179 knew of this behavior in 1997, and Local 179 has submitted evidence showing that when it learned of this behavior it filed grievances against two of the companies. And even if, as Kim's claims, Local 179 usually takes no action to enforce compliance with the ACA until an employee files a grievance, this has nothing to do with Local 179's right to enforce the ACA when it learns of violations—or to picket area employers who pay less than area standard wages.

### III. Conclusion

In sum, neither of the incidents relied on by Kim's can establish a violation of § 158(b)(4)(B), and we therefore grant Local 179's motion for summary judgment. It is so ordered.