**R.L. COOLSAET CONSTRUCTION CO., Plaintiff–Appellee, Cross–Appellant,**

v.

**LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, Defendant–Appellant, Cross–Appellee.**

Nos. 98–2102, 98–2526.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1999.

Decided May 7, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 14, 1999.

Lawrence D. Levien (argued), Joseph A. Turzi, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, Christopher Meyer, Dukes, Martin, Helm & Ryan, Danville, IL, for Plaintiff–Appellee, Cross–Appellant.

Dale D. Pierson (argued), Pasquale A. Fioretto, Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, David Stuckel, Harvey & Stuckel, Peoria, IL, for Defendant–Appellant.

Before FLAUM, RIPPLE, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

This is an appeal from judgment in favor of a contractor claiming that a union engaged in improper secondary picketing in violation of federal law and breached the "no–strike" clause in the parties' collective bargaining agreement. The union claims that its activity was aimed only at a non-union contractor on the same project, and to the extent it affected the secondary contractor, it was protected as a sympathy strike implicitly allowed by the terms of their bargaining agreement. The union also challenges the district court's damages award and the contractor cross appeals, claiming the court failed to include certain items in its calculation of prejudgment interest. We now affirm the district court's decisions regarding each of the union's claims, and reverse the court's calculation of damages.

## Background [1]

This dispute stems from a picket line set up by Local 150 ("Local 150") of the International Union of Operating Engineers ("IUOE") in June 1992, at the National Gas Pipeline Company's ("NGPL's") gas storage facility in Herscher, Illinois. In 1991, NGPL hired R.L. Coolsaet Company ("Coolsaet"), a union contractor, to repair a pipeline running into NGPL's gas compressor at the Herscher facility. As a member of the Pipe Line Contractors As-

---

1. The following account is based on the district court's finding of facts pursuant to FED. R.CIV.P. 52(a).

sociation ("PLCA"), a national trade group, Coolsaet was at all relevant times a signatory to a national collective bargaining agreement ("National Agreement") between the PLCA and the IUOE. Pursuant to this agreement, Coolsaet hired workers represented by Local 150, as well as workers represented by other craft unions, to perform the work at Herscher. Coolsaet worked in and around an 80–acre fenced-in area within the Herscher facility referred to as Station 201. In 1992, NGPL hired Haley Brothers, a local nonunion contractor, to perform water pipe installation work in the fields surrounding Section 201. At no time prior to the strike, however, did Coolsaet and Haley employees work in close proximity to each other.

On the morning of June 23, 1992, Local 150's steward, Roger Seale, and one of its business agents, Gary Benefield, met at Station 201 and drove three miles to an area called Saffer 3, where Haley was then working. There, Benefield told one of Haley's owners that its work should be performed by union labor and asked Haley to join Local 150. The owner refused. Soon after, John Filiatrault of NGPL arrived at Saffer 3 and told Benefield that Haley's work was a "separate job, separate contract, separate system," and that NGPL had the right to hire non-union contractors. Benefield responded that Haley's presence at Herscher could result in union picketing. That afternoon, Roger Seale repeated Benefield's warning to Coolsaet's office manager.

The same day, in an effort to avert a strike, NGPL scheduled a meeting with union representatives but called it off after concluding that the dispute was between Coolsaet and its unions, not between the union and NGPL. After the meeting was canceled, Benefield called other craft unions representing Coolsaet employees to inform them that Local 150 would likely begin picketing the following day, June 24, in front of Station 201.

Station 201 had three gates: the Main Gate, which was used by anyone with business at the site, Gate 2, which was locked during this period, and Gate 3, which was used exclusively by Coolsaet employees. On the morning of June 24, Benefield set up pickets in the area where Haley had been working the day before, and in front of the Main Gate, which Haley occasionally used to retrieve supplies stored inside Station 201. Benefield also set up pickets in front of Gate 3, despite the union's knowledge that only Coolsaet employees used that gate. The picket line included some Coolsaet employees.

Because none of its union employees would cross the picket line, Coolsaet's operation was completely shut down from June 24 until July 7. On June 25, Michael Quigley, the Local 150 business agent in charge of the picketing activity, requested a meeting with NGPL and representatives from other unions to discuss his concern about Haley working at Herscher. NGPL's manager, David Nightengale, informed Quigley that Haley had removed all of its supplies from Station 201 that day and asked why Local 150 continued to picket at that location instead of where Haley was actually working. Quigley responded that the union had the right to picket wherever it would be most effective.

The pickets remained in place in front of Station 201 from approximately 7:00 a.m. to 4:00 p.m. each day even though Haley no longer used either gate and Local 150 business agents did not know whether Haley was working on the site during those hours. During this period, Quigley told Coolsaet's manager, Ryan Colonello, that as long as Haley was still on the job, the picketing would continue.

The National Agreement between the PLCA and IUOE contained a broad no-strike provision (Article IX(A)) which prohibited the union from engaging in any "strike slowdown, stoppage of work or any interference ... with the progress of the work" and prevented the employer from ordering any lockout of union workers. On July 25, 1992, Hailey Roberts, the di-

rector of the PLCA, faxed a letter to Frank Hanley, president of the IUOE, informing him that Local 150 had set up a picket line at Herscher in violation of the no-strike clause in the National Agreement. On July 30, Howard Evans of the IUOE faxed Roberts' letter to Bill Dugan, president of Local 150, along with a cover note stating: "I am sure you are aware that Article [IX] of the National Pipeline Agreement contains a no strike clause." On July 2, Local 150 treasurer Joe Ward told Evans that "the picket line would be down on Monday [July 6]." When the strike continued on July 6, Evans faxed another letter ordering the removal of the picket line, which came down on July 7, 1992.

In September 1992, Coolsaet sued Local 150 for damages resulting from what it alleged was an illegal secondary picket in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 185 and 187. Coolsaet also claimed that Local 150 breached the no-strike clause of the National Agreement.

Following a four day bench trial, the court determined that because Local 150 had intended to exert pressure on Coolsaet and NGPL, neutral or secondary employers, in an effort to remove Haley from the Herscher site, the union violated Section 8(b)(4) of the NLRA. Additionally, the court held that Local 150 breached the no-strike clause of the National Agreement. Based on the delay and increased cost Coolsaet incurred as a result of the strike, the court initially awarded the contractor $329,467 in damages. After additional briefing by the parties, the court awarded Coolsaet $105,221 in compounded prejudgment interest based on all of the contractor's damages except those associated with equipment expenses on machines owned by Coolsaet.

Local 150 now appeals, claiming that it did not engage in any illegal secondary activity nor did it violate the National Agreement. The union also challenges the court's damages and interest calculations. Coolsaet cross-appeals, claiming that the interest award improperly excluded equipment expenses and should have been higher.

## Discussion

In reviewing the trial court's decision, we examine any legal conclusions de novo, *Orix Credit Alliance v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 474 (7th Cir.1997), but adopt its factual findings unless clearly erroneous. *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 891 (7th Cir.1986); Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous only when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The court's award of damages or prejudgment interest is reviewed for abuse of discretion. *Treat Bros. Co. v. Fidelity and Deposit Co.*, 986 F.2d 1110, 1121 (7th Cir.1993). An abuse of discretion exists where the district court has made a manifest error of law, but this court does not second-guess the exercise of discretion that falls within the range of reasonable options. *See American Nat'l Bank & Trust Co. v. Regional Transp. Auth.*, 125 F.3d 420, 431 (7th Cir.1997). With these standards in mind, we examine each of the claims raised on appeal.

### Unlawful Secondary Boycott

Section 303 of the LMRA provides a private cause of action for a party injured by union conduct defined as an unfair labor practice under Section 8 of the NLRA. 29 U.S.C. § 187. Section 8(b)(4), in turn, defines picketing as an unfair labor practice if "any object of that activity is to exert improper influence on secondary or neutral parties." *International Union of Operating Engineers, Local 150, AFL–CIO v. NLRB*, 47 F.3d 218, 223 (7th Cir.1995). As this court has explained:

Where a union has a grievance with the terms and conditions of employment of a certain employer, (the "primary" employer), it must focus its picketing activity on that employer. The union may not exert pressure on an unrelated, "secondary" [or neutral] employer in order to coerce the secondary employer to cease dealing with the primary employer, thereby advancing the union's goals indirectly.

*Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1120 (7th Cir.1989). Section 8(b)(4)'s prohibition covers situations where the union acts with mixed motives: "It is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary." *Id.* at 1121 (internal citations omitted); *see also BE&K Construction Co. v. Will & Grundy Counties Building Trades Council, AFL–CIO*, 156 F.3d 756, 761 (7th Cir.1998). The union's motive is a question of fact to be determined by an examination of the "totality of [the] union's conduct in [a] given situation." *International Union of Operating Engineers*, 47 F.3d at 223.

■ The analysis of secondary activity is more complicated where the primary and secondary employers share a common work site. *Id.* at 762. In that situation, because it is difficult or impossible to target the primary employer without having a substantial effect on a secondary employer, Section 8(b)(4) has been interpreted to allow some foreseeable secondary impact so long as the union does not intend to enmesh the secondary employer in the dispute. *See Mautz & Oren*, 882 F.2d at 1121. Claims of secondary picketing at a common work site are analyzed under an evidentiary framework known as the *Moore Dry Dock* standards. *See Sailor's Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549, 1950 WL 9143 (1950). Under these standards, a union's picketing is presumed to be lawful primary activity if

(1) it is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (2) at the time of the picketing the primary employer is engaged in its normal business at the situs; (3) the picketing is limited to places reasonably close to the location of the situs; and (4) the picketing discloses clearly that the dispute is with the primary employer. *International Union of Operating Engineers*, 47 F.3d at 223. However, *Moore Dry Dock* only sets up a presumption which is rebutted by evidence of an unlawful intent. *Id.* Therefore, whether *Moore Dry Dock* is used to examine union conduct or not, the question remains a factual inquiry into the union's actual state of mind. *Id.*

■ The district court doubted whether *Moore Dry Dock* applied to this case because Haley's and Coolsaet's operations were more than a mile apart and thus the Herscher facility did not constitute a single work site. Even so, the court indicated that the *Moore Dry Dock* standards had not been met, particularly the limitations on the time and place of picketing. Ultimately, however, the court held that *Moore Dry Dock* was irrelevant because it found by a preponderance of the evidence that Local 150 intended to pressure secondary employers Coolsaet and NGPL in its effort to rid the Herscher facility of Haley. Essentially, the court concluded that one of the purposes of Local 150's picket line was to disrupt Coolsaet's operation by keeping its union employees from crossing it. This in turn would induce NGPL to either force Haley into joining the union or to kick the contractor off the premises in order to resume work.

The court based its conclusion on a number of factual findings: Local 150 set up pickets in front of Gate 3 despite its knowledge that only Coolsaet employees used that gate; the union used Coolsaet employees on its picket line; the continued picketing of Station 201 after Haley no longer stored material there; the union's maintenance of the picket line without re-

gard to whether Haley was on the site or not; the union's failure to target Haley with its pickets and focus instead on areas where it knew Coolsaet was working; and, finally, the statements by Local 150 business agents made to representatives of Coolsaet and NGPL that the pickets would only come down if Haley was removed. Based on these findings, the court held that the union was "overtly exerting improper pressure on neutral employers [Coolsaet and NGPL]" in violation of Section 8(b)(4).

Local 150 now argues that the court's legal conclusions were not supported by the facts and that many of the court's key factual findings were incorrect. The union suggests that the court misinterpreted Local 150's actions and failed to credit certain testimony which contradicted the court's factual findings. Essentially, the union counters each key fact with its own version of events, reiterating what it argued before the district court.

 However, the union has failed to overcome the considerable burden it bears in attempting to refute the district court's factual findings. *See Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 891 (7th Cir.1986). In challenging these findings, the union relies primarily on the testimony of its own representatives Benefield and Seale. Yet, the trial court specifically discredited these witnesses on key factual issues because their testimony was "vague, selective and, therefore, lacked credibility." When findings of fact are based on determinations regarding the credibility of witnesses, our review is particularly deferential: "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of

and belief in what is said." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Without objective evidence to the contrary, the court's credibility rulings are extremely difficult to overturn. *Rumsavich v. Borislow*, 154 F.3d 700, 703 (7th Cir.1998); *In re Generes*, 69 F.3d 821, 825 (7th Cir.1995); *Dunning v. Simmons Airlines Inc.*, 62 F.3d 863, 868 (7th Cir.1995). Because we consider the court's findings to be well supported by the record, and because the union has failed to present any objective evidence to the contrary, we will not disturb them.

Given these factual findings, we also agree with the court's legal conclusion that Local 150 engaged in improper secondary activity. Even if this case is analyzed under *Moore Dry Dock*,[2] the court reasonably concluded that at least one of the union's objectives was to pressure Coolsaet and NGPL into forcing Haley off the Herscher site. The court's finding that Benefield and Quigley maintained the pickets at Station 201 without regard to where or when Haley was working supports the court's conclusion that Local 150 had failed to satisfy two of *Moore Dry Dock*'s standards: that picketing be limited to the times and places the primary employer worked. This failure sets up a presumption of secondary intent which Local 150 has not rebutted. *International Union of Operating Engineers, Local 150, AFL–CIO*, 47 F.3d 218, 223 (7th Cir.1995). Moreover, we are satisfied that, in addition to its failure to narrowly target Haley's operations, the use of Coolsaet's employees on the picket line as well as the statements to Coolsaet and NGPL that the pickets would remain until Haley was removed from Herscher all strongly support the

**2.** Although the court did not hold that *Moore Dry Dock* applied to this case, it nonetheless concluded that under its standards Local 150's conduct was not legal. While we share the court's skepticism that the Herscher facility is a single work site triggering *Moore Dry Dock*, because the court found actual evidence of an intent to exert secondary pressure we

need not decide this question. *See Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1121 (7th Cir.1989) ("The question throughout remains a factual inquiry into the union's actual state of mind under the totality of the circumstances.").

notion that at least one of Local 150's purposes was to exert secondary pressure. *Id.*

The union argues that the statements it made to Coolsaet and NGPL were protected by the Supreme Court's decision in *NLRB v. Servette,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), which held that non-threatening statements concerning protected activity do not violate Section 8(b)(4). This argument is unavailing. In *Servette,* the Court held that a union could ask managers of a secondary employer not to handle goods of the primary employer. *Id.* at 51, 84 S.Ct. 1098. The court specifically noted that the union was not "attempting to induce or encourage them to cease performing managerial duties in order to force their employers to cease doing business with [the primary employer]." *Id.* Here, however, the court interpreted Local 150's statements to be just that—an attempt to induce or encourage Coolsaet and NGPL to cease doing business with Haley. Because we believe the court did not err in interpreting these statements as it did, they are not protected by the holding in *Servette.* *See BE&K Construction Co. v. Will & Grundy Counties Building and Trades Council,* 156 F.3d 756, 769 (7th Cir.1998) ("[T]he union cannot avoid liability for illegally threatening a secondary employer by conveying the threat with innocuous words, implications and body language."); *Pickens Bond Const. Co. v. United Brotherhood of Carpenters,* 586 F.2d 1234, 1240 (8th Cir.1978) ("Selection of permissible inferences raised by evidence is primarily a function of the trial court and findings thus will stand unless clearly erroneous.").

While the line between permissible primary activity and unlawful secondary activity may be "more nice than obvious,"

*Local 761, Elec. Workers v. NLRB,* 366 U.S. 667, 674, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), Local 150 clearly crossed it at Herscher.

### Breach of the National Agreement

■ The union next argues that it did not breach the National Agreement because Coolsaet failed to exhaust contractual remedies and because the Agreement's no-strike provision did not cover the kind of picketing at issue.

The trial court concluded that although Article IX(A) [3] of the National Agreement states that all disputes concerning the Agreement were to be arbitrated, Article IX(B) allows either party to opt out of the arbitration clause and go directly to court if the dispute involves a union strike or an employer lock-out. Article IX(B) provides in relevant part:

> If the local union ... causes or promotes a strike, slowdown, work stoppage or any interference with the operation or progress of the work ... then the Employer ... may at its option declare the provisions of [the arbitration clause] inoperative and seek whatever remedy may be available from the National Labor Relations Board or any Federal or State court having jurisdiction over the matter.

The trial court decided that because Coolsaet chose to pursue its remedy in federal court, it had triggered Article IX(B) and did not need to arbitrate the dispute.[4]

■ Local 150 now argues that Coolsaet never actually "declared" that the arbitration clause was inoperative, so it is still in effect and the employer is still bound by its requirements. We reject this formalistic assertion. Article IX(B) does not appear to require any specific declara-

---

3. Article IX(A) provides:
 All grievances, disputes, differences of opinion and other questions concerning this Agreement shall be settled in accordance with the procedures for settlement of grievances and disputes set out in [Article X, the arbitration clause] below.

4. Section 301 of the LMRA confers federal jurisdiction over claims for breach of collective bargaining agreements. *See* 29 U.S.C. § 185.

tion language and none should be inferred. It is hard to imagine a clearer declaration that the arbitration clause is inoperative than the filing of this suit. Article IX(B) clearly allows an employer to by-pass the arbitration requirement if the dispute involves a work stoppage. Although parties to a collective bargaining agreement must normally exhaust contractual arbitration before pursuing other remedies, *see Mautz & Oren*, 882 F.2d at 1126–27, they need not do so if the agreement does not require arbitration over the dispute at issue. *Cf. Drake Bakeries, Inc. v. Local 50*, 370 U.S. 254, 257–60, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962) (holding that because parties had failed to carve out the issue in question from the arbitration clause, it needed to be arbitrated).

 Local 150 also argues that despite the no-strike clause, it still had a right to sympathy strike [5] because the National Agreement did not specifically prohibit it. Relying on our decision in *Indianapolis Power and Light v. NLRB*, 898 F.2d 524 (7th Cir.1990), the union argues that without extrinsic evidence of an intention to waive sympathy strikes, it may still engage in them.

However, whether we apply the rule stated in *Indianapolis Power* or not,[6] the language of the National Agreement, as well as certain extrinsic evidence, convince us that the parties intended the kind of strike at issue to be included in the no strike clause. First, the no-strike clause is accompanied by a specific sympathy strike exception which does not cover Local 150's actions at Herscher. That exception provides:

> It shall not be a violation of this Agreement or of the no-strike clause if members of the International Union of Operating Engineers refuse to cross a picket line established by another craft union within the pipe line industry.

Article IX(D). This exception for certain sympathy strikes—those in observance of other unions' picket lines—strongly implies that sympathy strikes in general were included in the no-strike clause, for if they were not, there would be no need for an exception. The fact that sympathy strikes in favor of Local 150's own picket lines are not included in the specific exception similarly indicates that the union's actions here fell "within the purview of the no-strike clause." *Indianapolis Power*, 898 F.2d at 528; *see also Plumbers and Steamfitters*

---

**5.** As the term is used in this case, a sympathy strike is essentially the refusal of union members to cross a picket line when they are not themselves the subject of the dispute. *See Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287 (7th Cir.1975). It is recognitional in nature and generally considered protected by Section 7 of the NLRA, 29 U.S.C. § 157. The right to sympathy strike may, like other strike rights, be waived by clear and unmistakable contractual language. *See NLRB v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393, 399 (7th Cir.1971).

**6.** We recognize that the rule stated in *Indianapolis Power* is not necessarily the law of this circuit. Our decision in that case was the result of its unusual procedural posture. The Court of Appeals for the D.C. Circuit had announced the rule (that in the absence of extrinsic evidence, no strike clauses do not automatically include sympathy strikes) prior to remanding the case. *Indianapolis Power*, 898 F.2d at 526. On a subsequent appeal the case was transferred to this court. *Id.* In holding that the rule announced by the D.C. Circuit would be considered the law of the case and applicable to the parties in the suit, we said that "far from being clearly erroneous, we believe that the [rule] is reasonable and consistent with the [NLRA] ... [It] reasonably accommodates the two important policies: that a waiver of statutory rights is not to be lightly inferred, and that parties should be free to bargain and enter into an agreement reflecting their bargains." *Id.* at 529. Because sympathy strikes are analytically distinct from traditional strikes, *see Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287 (7th Cir.1975), we see no reason to assume that a no strike clause automatically includes them. Yet the question of whether *Indianapolis Power* controls this case is not squarely before us, and because we believe the language and history of the National Agreement clearly forbid this kind of work stoppage, we need not address the issue further here.

*Local 150 v. Vertex Const. Co.*, 932 F.2d 1443, 1449 (11th Cir.1991) ("The doctrine of expressio unius est exclusio alterius instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."); *see also Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 179 (1st Cir.1995) ("While this interpretive maxim [expressio unius] is not always dispositive, it carries weight."). Additionally, based on the history of negotiations between the PLCA and the IUOE, the court concluded that "the no-strike clause in the National Agreement represents a fifteen year drafting effort by the parties to the agreement to eliminate work stoppages caused by recognitional picketing." More specifically, a Coolsaet witness testified that the no strike clause was added to the Agreement in response to the activity of Local 2 of the IUOE, which had engaged in strikes similar to the one at issue here. Thus, both the structure of the National Agreement, with its specific sympathy strike exception, and its bargaining history clearly point to the conclusion that Local 150's activities fall within the prohibition of the no strike clause. *See Inland Steel Co. v. NLRB*, 719 F.2d 205, 207 (7th Cir.1983); *Amcar Div., ACF Industries v. NLRB*, 641 F.2d 561, 567 (8th Cir.1981); *cf. Indianapolis Power*, 898 F.2d at 530 (evidence that parties "agreed to disagree" about whether certain strikes were covered by the no-strike clause held not sufficient to waive the right to engage in those strikes). We therefore see no error in the district court's conclusion that the union breached the National Agreement.

### Damages and Interest

Local 150 next argues that even if it engaged in improper secondary activity at Herscher, the court erred in awarding Coolsaet damages, or alternatively, that its damage award was excessive. In either case, claims Local 150, the court erred in awarding pre-judgment interest.

### Damages

■ The trial court awarded Coolsaet damages based on what the court found to be a twelve day delay (in addition to the eleven days of the strike itself) in completion of the project which was directly attributable to the strike.[7] This post-strike delay resulted from work that had to be redone and lost time and efficiencies remobilizing the project. The damages figure includes increased payroll and equipment expenses as well as other miscellaneous expenses associated with the strike-induced delay.

■ Local 150 now claims that the award should be reversed because the damages calculation was purely speculative. *See Mid–America Tablewares v. Mogi Trading Co.*, 100 F.3d 1353, 1367–69 (7th Cir.1996). This argument is essentially another challenge to the court's factual findings. Yet the union fails to show how any are clearly erroneous. On the contrary, the court reasonably calculated a delay of twelve days based on an estimated completion date made just prior to the strike and comparing it to the actual completion date. The evidence also supports the court's finding that work needed to be redone after the strike and that Coolsaet experienced serious problems re-mobilizing its workforce. Both of these delay factors are directly attributable to the strike and the expenses associated with them are compensable. *American Bridge Division, U.S. Steel Corp. v. International Union of Operating Engineers, Local 487*, 772 F.2d 1547, 1552 (11th Cir.1985) (increased costs associated with 50% reduction in efficiency attributable to illegal strike recoverable); *John B. Cruz Co. v. United Brotherhood of Carpenters & Joiners*, 907 F.2d 1228, 1232 (1st Cir.1990) (holding damages recoverable under Section 303 of NLRA, 29 U.S.C. § 187, for harm done by illegal secondary boycott).

7. The court essentially arrived at the twelve day figure by comparing—with certain adjustments—the pre-strike estimated completion or "tie-in" date with the actual "tie-in" date.

The actual cost figures applied to the delay are not disputed by the union. That the exact amount of loss suffered by Coolsaet cannot be determined with absolute certainty does not bar recovery: "While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation." *Refrigeration Contractors, Inc. v. Local Union No. 211*, 501 F.2d 668, 671 (5th Cir.1974); *see Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 505–06 (7th Cir.1992) (compensatory damages must rest on just and reasonable estimate based on relevant data).

▆▆▆▆ Next, relying on a decision from the Ninth Circuit, *Matson Plastering Company, Inc. v. Plasterers & Shophands Local 66*, the union claims that the court erred in awarding damages based on equipment expenses because only "out of pocket expenses paid to third parties as a result of picketing" are compensable under Section 303. 852 F.2d 1200, 1203 (9th Cir.1988). Their argument is that Coolsaet owned all its own equipment and thus it should not be compensated for equipment expenses because they were not out-of-pocket and not paid to third parties.[8] Nothing in *Matson*, however, supports this constrained approach to damages. On the contrary, that court discussed lost profits—something neither out of pocket nor paid to third parties—as a recoverable item under the NLRA. *Id.* at 1202 (citing *Frito–Lay, Inc. v. Local 137, International*

*Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers*, 623 F.2d 1354, 1363 (9th Cir.1980)). As other courts have recognized, idle equipment (or equipment which must remain on a job site because the project is delayed) is a real and quantifiable loss to the contractor, whether rent is paid to another or charged to the contractor himself as an accounting expense,[9] and it is recoverable. *American Bridge Division, U.S. Steel Corp. v. International Union of Operating Engineers, Local 487*, 772 F.2d 1547, 1553 (11th Cir. 1985); *Frito–Lay, Inc.*, 623 F.2d at 1364; *Metropolitan Paving Co. v. International Union of Operating Engineers*, 439 F.2d 300, 305 (10th Cir.1971). The trial court did not abuse its discretion by including these expenses in its calculation of damages.

### Interest

▆▆▆▆ After requesting additional briefing, the trial court decided to award Coolsaet an additional $105,221, which represents the compounded interest on Coolsaet's total damage award except for the amount awarded for equipment costs. *Beelman Truck Company v. Chauffeurs, Teamsters, Warehousemen and Helpers*, 33 F.3d 886, 892 (7th Cir.1994) (award of interest under the LMRA is at discretion of the trial court). The union now challenges that decision.

Initially, Local 150 argues that Coolsaet's request for interest, which is normally treated as a Rule 59(e) motion, was untimely because it was filed more than

---

8. Local 150 also argues that the court failed to deduct the damage to Coolsaet attributable to lawful primary conduct from unlawful secondary activity. *See Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers Local 494*, 798 F.2d 1016 (7th Cir.1986). The district court rejected this contention by noting that the union had failed to even suggest how any of Coolsaet's requested damages resulted from Local 150's picketing of Haley alone and not from the picketing at Station 201, which the court held was entirely tainted with secondary intent. We see no error in the court's reasoning.

9. Contractors must charge themselves rent on equipment they own. This rent essentially accounts for the depreciation (the real decline in the value of the equipment) as well as finance costs, insurance and certain taxes. As the equipment sits idle, these expenses accumulate without generating any offsetting revenue. Even if the equipment is owned by the contractor free and clear of finance charges, keeping the equipment on a project longer than expected without a corresponding increase in revenue entails opportunity costs. *See Frito–Lay, Inc.*, 623 F.2d at 1364.

ten days after the court entered its judgment. Fed.R.Civ.P. 59(e); *see McNabola v. Chicago Transit Authority,* 10 F.3d 501, 520 (7th Cir.1993) (court lacks jurisdiction to hear untimely requests for interest). Yet as the court explained, Coolsaet requested interest well before judgment was rendered. After awarding Coolsaet damages, the court requested an additional brief from Coolsaet in support of the interest award. Although this brief was filed more than ten days after the judgment, because Coolsaet's initial request is treated as a Rule 59(e) motion, it was timely. *See John Hancock Healthplan of Penn. v. Lexington Ins. Co.,* 1991 WL 63854 (E.D.Pa.1991); *Dunn v. Truck World Inc.,* 929 F.2d 311 (7th Cir.1991); *Jurgens v. McKasy,* 905 F.2d 382 (Fed.Cir.1990); *Protective Nat. Ins. v. Safety Nat. Casualty Corp.,* 19 F.3d 28 (9th Cir.1994).

■■■■■ Next, the union claims that because their actions were not intentional or outrageous and because the underlying damages were speculative, prejudgment interest was inappropriate. *See Gorenstein Enterprises v. Quality Care–USA,* 874 F.2d 431, 436 (7th Cir.1989). We are not convinced. While prejudgment interest may be inappropriate where the defendant had no reason to know of the wrongfulness of its actions, *see Wickham Contracting Co. v. Local No. 3, International Brotherhood of Electrical Workers,* 955 F.2d 831, 833–34 (2nd Cir.1992), that is not the case here. Indeed, a violation of Section 8(a)(4) requires, and the district court found, an unlawful intent. *See Mautz & Oren, Inc. v. Teamsters Local 279,* 882 F.2d 1117, 1120–21 (7th Cir.1989). Nor is the fact that the damages award could not be calculated with absolute precision a bar to prejudgment interest. *See Wickham,* 955 F.2d at 836. As noted above, the court's damages award was well supported by the record, and awarding prejudgment interest was appropriate. *P.A. Bergner & Co. v. Bank One,* 140 F.3d 1111, 1123 (7th Cir.1998) ("[P]rejudgment interest should not be thought of as

a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money.").

*Cross–Claim for Interest*

■■■■■ Before calculating the amount of prejudgment interest, the district court subtracted from the total damages amount the sum designated as Coolsaet's equipment expenses. Apparently, the trial court concluded that because Coolsaet owned its equipment this money was not "out-of-pocket" and could not have been invested, so it would not have earned any interest. Coolsaet maintains, however, that this decision deprived it of complete compensation and the interest award should be increased. We agree. Prejudgment interest is based on the notion that a plaintiff is not fully compensated unless it receives interest for the time it was deprived the use of its money. *See Partington v. Broyhill Furn. Indus. Inc.,* 999 F.2d 269, 274 (7th Cir.1993). This court has explained that:

> Money today is not a full substitute for the same sum that should have been paid years ago. Prejudgment interest therefore is an ordinary part of any award under federal law. By committing a tort, the wrongdoer creates an involuntary creditor. It may take time for the victim to obtain an enforceable judgment, but once there is a judgment the obligation is dated as of the time of the injury.... Prejudgment interest at the market rate puts both parties in the position they would have occupied had compensation been paid promptly.

*In re Oil Spill by Amoco Cadiz,* 954 F.2d 1279, 1331 (7th Cir.1992); *see also NLRB v. International Measurement and Control Company,* 978 F.2d 334, 336 (7th Cir. 1992). As discussed above, the equipment expenses at issue represent actual, compensable losses to the contractor. *American Bridge Division, U.S. Steel Corp. v. International Union of Operating Engineers, Local 487,* 772 F.2d 1547, 1553 (11th Cir.1985); *Frito–Lay, Inc.,* 623 F.2d at

**662**

1364; *Metropolitan Paving Co. v. International Union of Operating Engineers,* 439 F.2d 300, 305 (10th Cir.1971). Had Coolsaet been compensated for its equipment loss when it occurred, it could have put that money to productive use. *In re Oil Spill by Amoco Cadiz,* 954 F.2d at 1331. For the purpose of prejudgment interest, we see no reason, nor find any in the case law, for treating the damages items awarded to Coolsaet differently. We therefore conclude that the contractor is entitled to interest on the entire amount.[10]

### Rule 38 Sanctions

■ After briefs were submitted on this appeal, Coolsaet moved for damages and costs pursuant to Rule 38 of the Federal Rules of Appellate Procedure. Rule 38 states: "If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." In *Spiegel v. Continental Illinois Bank,* 790 F.2d 638 (7th Cir.1986), we stated, "an appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." *Id.* at 650 (citations omitted). Coolsaet argues that because the bulk of Local 150's argument on appeal depended on this court overturning the district court's credibility determinations, the union had no chance of prevailing. *See District 8, International Association of Machinists & Aerospace Workers, AFL–CIO v. Clearing, Division of U.S. Industries, Inc.,* 807 F.2d 618, 623 (7th Cir.1986) (appeal based solely on assertion that district court should have credited appellant's witnesses rather than appellee's was frivolous and justified Rule 38 sanctions); *Rennie v. Dalton,* 3 F.3d 1100, 1110 (7th Cir.1993) (same). Although Local 150 failed to provide us with a basis for overturning the district court's decision, we do not believe

the appeal was frivolous. Local 150 raised substantial, if non-meritorious, legal challenges to the district court's finding of secondary activity, its interpretation of the no-strike clause and its calculation of damages. *Hal Commodity Cycles Management Co. v. Kirsh,* 825 F.2d 1136, 1139 (7th Cir.1987). Because the union's arguments created some plausible chance of reversal on each of these grounds, *see Borowski v. DePuy, Inc.,* 876 F.2d 1339, 1341 (7th Cir. 1989), we do not consider this is an appropriate case for sanctions. *See id.* Therefore, Coolsaet's motion is denied and each party shall bear its own costs.

### Conclusion

We agree with the district court's decision that Local 150 engaged in illegal secondary activity and breached the no-strike clause in the collective bargaining agreement it had with Coolsaet. We also agree with all but one of the district court's damages determinations. Therefore, we AFFIRM in part, REVERSE in part and REMAND for recalculation of prejudgment interest.

---

10. Our conclusion might have been different if, for example, the court had concluded that the equipment expenses were far more speculative than the other expenses or were otherwise suspect. *See Wickham Contracting v. Local No. 3, International Brotherhood of* *Electrical Workers,* 955 F.2d 831, 833–4 (2d Cir.1992). But the court's decision to exclude them from the interest calculation appears to be based only on the notion that they are not out-of-pocket expenses.