NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3580
_____

U.S. INFORMATION SYSTEMS, INC.

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL UNION NUMBER 164, AFL-CIO,

Appellant

v.

GALE CONSTRUCTION COMPANY; ERNST & YOUNG, LLP;
PREFERRED COMMUNICATION TECHNOLOGIES;
ABC CORPORATIONS 1-26; JOHN DOES 1-26
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 08-cv-01125
(Honorable Jose L. Linares)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 10, 2012

Before:  SCIRICA, ROTH and BARRY, *Circuit Judges*.

(Filed: October 4, 2012)

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

The defendant, International Brotherhood of Electrical Workers Local Union Number 164 ("Local 164"), appeals the District Court's judgment in favor of U.S. Information Systems, Inc. ("Systems"), finding Local 164 liable for unlawful labor practices under Section 8(b)(4)(i)(B) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(i)(B). We will affirm.

I

This case arises out of a labor dispute between Local 164 and Systems. Systems provides technology installation services in the New York Metropolitan area. Systems subcontracts with U.S. Information Services, Inc., which uses technicians affiliated with the Communications Workers of America, AFL-CIO, Local 1106 ("Local 1106"). Local 164 is a labor organization representing electricians affiliated with International Brotherhood of Electrical Workers ("IBEW"). There is a longstanding dispute between Systems and Local 164 involving the rate of compensation for technicians, as Local 164 maintains Systems pays its technicians below the area standard rates.

In 2006, Ernst & Young, LLP, sent out a request for proposals for telecommunication work at its office in Secaucus, New Jersey. Preferred Communication Technologies ("PCT") and Star-Lo Communications are both contractors who bid on the project. PCT planned to subcontract the installation of the telecommunication equipment to Systems, while Star-Lo would subcontract to Local 164. PCT was awarded the contract, and Systems provided U.S. Information Services, Inc. technicians (Local 1106) to install the telecommunications equipment.

On August 16, 2007, Local 164 placed pickets at the site of the project, which resulted in the project being shut down. Local 164 contends the purpose of the picketing was to publicize Systems' substandard wages; Systems counters that Local 164's intent was to influence other trade employees to refuse to work on the project in order to force PCT to terminate its contract with Systems. When the dispute could not be resolved, PCT terminated its agreement with Systems. Star-Lo replaced Systems on the project and provided Local 164 technicians to install the equipment.

Systems brought a claim against Local 164 alleging the union's actions constituted a secondary boycott in violation of §§ 8(b)(4)(i)(B) and (D) of the National Labor Relations Act ("NLRA"). The District Court granted Systems' motion for summary judgment as to its secondary boycott claim under § 8(b)(4)(i)(B), but denied the remaining claims.[1] Local 164 appealed.[2]

## II[3]

Summary judgment is granted when viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact where a reasonable jury could not find for the nonmoving

---

[1] The District Court entered a final judgment in favor of Systems for $180,000; the amount of the judgment is not appealed. Defendant was granted summary judgment on Plaintiff's claim for tortious business interference. Plaintiff's application to enjoin Defendants from future secondary boycotts was denied.

[2] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 187. We have jurisdiction under 28 U.S.C. § 1291.

[3] We review a district court's decision granting summary judgment under a de novo standard of review. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011).

party on the evidence.  *Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012).  Section 303 of the Labor Relations Management Act ("LMRA"), 29 U.S.C. § 187, provides a private cause of action for a party injured by a union's conduct defined as an unfair labor practice in § 8 of the NLRA.

It is an unlawful labor practice for a union to engage in a secondary boycott. Section 8(b)(4)(i)(B) prohibits a union from inducing a person to refuse to work for a neutral employer with the purpose of compelling that employer from doing business with the primary, offending employer.  *Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1241, 1249 (3d Cir. 1991).[4]  The secondary boycott provisions are intended to prevent a union from influencing a neutral third party's relationship with a primary employer in order to compel the primary employer to consent to the union's demands. *Taylor Milk Co. v. Int'l Bhd. of Teamsters, AFL-CIO*, 248 F.3d 239, 246 (3d Cir. 2001). Regardless of whether "the 'sole object of the strike was secondary'" it is unlawful "'so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary.'" *R.L. Coolsaet Constr. Co. v. Local 150, Int'l Union of Operating*, 177 F.3d 648, 655 (7th Cir. 1999) (quoting *Mautz & Oren, Inc. v. Teamsters*

---

[4] (b) Unfair labor practices by labor organization. It shall be an unfair labor practice for a labor organization or its agents--
(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; ... where in either case an object thereof is--
(B) forcing or requiring any person ... to cease doing business with any other person, ... *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.  29 U.S.C. § 158(b)(4)(i)(B).

4

*Union, Local No. 279*, 882 F.2d 1117,1121 (7th Cir. 1989). The union's motive in conducting the picket is a question of fact to be determined by an examination of the "totality of [the] union's conduct in [a] given situation." *Id.* (quoting *Int'l Union of Operating Eng'rs Local 150, AFL-CIO v. NLRB*, 47 F.3d 218, 223 (7th Cir. 1995).

Local 164 contends the District Court erred in failing to analyze the case using the *Moore Dry Dock* standard. The *Moore Dry Dock* standard creates a presumption that picketing is a lawful primary activity when it meets four criteria. *Sailors' Union of the Pac. (Moore Dry Dock Co.)*, 92 NLRB 547 (1950). "However, *Moore Dry Dock* only sets up a presumption which is rebutted by evidence of an unlawful intent. Therefore, whether *Moore Dry Dock* is used to examine union conduct or not, the question remains a factual inquiry into the union's actual state of mind." *R.L. Coolsaet Constr. Co*, 177 F.3d at 655. *See also, Fidelity Interior Constr., Inc. v. Se. Carpenters Reg'l*, 675 F.3d 1250, 1263 (11th Cir. 2012) ("Even if the more 'objective' requirements of *Moore Dry Dock* … are satisfied, if the totality of the circumstances unequivocably [sic] demonstrates a secondary purpose existed, the picketing should be deemed unlawful."). Accordingly, a union's unlawful purpose in picketing overcomes any presumption created under the *Moore Dry Dock* standard.

The District Court found there was no genuine dispute that the true object of Local 164's picketing was to force PCT to terminate its contract with Systems (and Local 1106) and to award the project to one of its own signatories. Local 164 claims the purpose of picketing was to publicize that Systems was paying its technicians below area standard wage. But Local 164 failed to present evidence that Systems' wages were substandard.

5

Moreover, Local 164 presented no evidence it made a "bona fide attempt … to determine if the Company was paying less than the area standards wage." *NLRB v. Int'l Union of Operating Engineers*, 624 F.2d 846, 849 (8th Cir. 1980). Local 164's failure to present evidence of Systems paying substandard wages coupled with the circumstances surrounding the picketing demonstrates its true motive in the picketing was not to publicize Systems wages.[5]

In the time period leading up to picketing, Local 164 was aggressively pursuing the project for its technicians.[6] The President of Gale Construction, Stephen Trapp,[7] testified at his deposition that days before picketing, a representative from Star-Lo called and said there was going to be "a problem with the IBEW relative to the telecommunication work," and that he "could solve the problems that are going on down there." Local 164 representatives Misciagna and Clay established the picket at the busiest entry points to the project with the understanding that tradesmen typically honor a picket line. As a result of picketing, approximately one hundred tradesmen stopped

---

[5] Local 164 claims that it is familiar with Systems' wages because it has a long-standing dispute with Systems regarding the wages it pays its technicians. But the record does not support this claim. Keith Misciagna, a business agent of Local 164, testified that (1) he did not understand the distinction between Systems and U.S. Information Services, ("At the time of the picket, I did not know the difference between the two organizations."); (2) he did not know if Systems had subcontracted the work to anyone; (3) he did not know whether the copy of the CBA was between Systems or USIS and Local 1106 of the CWA; and (4) he did not know the hourly rate of USIS' technicians at the time of the picket.

[6] Local 164 made $50,000 in Target Funds available to Star-Lo in order to obtain the project. Even after the project was awarded to Systems, Local 164 continued to make this money available in the hopes of obtaining the contract.

[7] Gale Construction Company was the general contractor managing the project.

working on the project which halted construction.[8]  The project stopped, and Local 164 agreed to terminate picketing in exchange for Systems not working on the project.[9] James Zappala, PCT's president, attempted to obtain a resolution to end Local 164's picketing and allow the project to proceed but Local 164 representatives were not receptive.[10]  Local 164 once again offered its target funds in an attempt to obtain the project for its technicians.  Star-Lo was ultimately awarded the contract and used Local 164 technicians for the work on the project.  Finally, PCT's letter to Systems terminating the contract explained picketing necessitated the termination of the work agreement. The September 11, 2007, letter reads:

> I regret having to terminate our agreement because it is evident that [Systems]  is fully capable of bring[ing] in this project on time and on budget with the highest level of quality.  Unfortunately, due to the picket at the site by the IBEW Local

---

[8] Clay testified that as a result of the picket approximately one hundred people were outside the building honoring the picket.

[9] Trapp testified:
> Q: You said you spoke with Steve and Keith [of Local 164], … regarding them leaving in exchange for USIS not working on the project; is that correct?
> A: Regarding, you know, removing the picket line, right.
> Q: And did those individuals then remove the picket line?
> A: Yes, I believe so.

[10] Zappala testified:
> Q: During the course of that conversation with Mr. Misciagna, he never agreed to any type of solution for this matter, did he?
> A: No.  I had a hard time getting anything out of him.  I got stonewalled.
> Q: While you were having the conversation with Mr. Misciagna, did you get the sense that he was going to give you a viable resolution to this matter?
> A: I think he had a resolution, but he wasn't going to speak.  He was very careful not to state it.
> Q: What was that resolution?
> A: My conclusion was that there would be no resolution until an IBEW contractor was on that project. He told me that he had been there. He had been lobbying for this. That basically they owned it. They did the majority of the work. And he wasn't going away.

7

164 and the offer of target funds by Star-Lo Electric, I was placed in a position by Ernst & Young with no other option.  The IBEW had placed enough fear in Ernst & Young that if I did not bring in an IBEW contractor the project would be in serious  jeopardy.

No reasonable jury could find on this evidence the sole motive for Local 164's picketing was to publicize substandard wages.  Instead, all evidence shows the picketing was to compel PCT to award the contract to one of Local 164's affiliates.  Because the purpose of Local 164's picketing was to induce a neutral third party to cease doing business with Systems, Systems is entitled to judgment as a matter of law.  Accordingly, summary judgment was proper.

### III

For the foregoing reasons, we will affirm the District Court's judgment in favor of Plaintiff for $180,000.