**FORD CONTRACTING,
INC., Appellant**

v.

**KENTUCKY TRANSPORTATION
CABINET, Appellee.**

No. 2012–CA–000554–MR.

Court of Appeals of Kentucky.

Feb. 7, 2014.

Rehearing Denied April 7, 2014.

Buckner Hinkle (argued), Jr., Mark R. Overstreet, Lexington, KY, for appellant.

Robert C. Moore (argued), Thomas J. Hellmann, Frankfort, KY, for appellee.

Before ACREE, Chief Judge; LAMBERT and STUMBO, Judges.

## OPINION

ACREE, Chief Judge:

Ford Contracting, Inc. appeals the February 21, 2012 order of the Franklin Circuit Court reversing in part and affirming in part the 2010 Final Order of the Kentucky Transportation Cabinet. Having carefully reviewed the record and the arguments of the parties, we affirm in part, reverse in part, and remand for additional proceedings.

### I. *Facts and Procedure*

In 2004, the Department of Highways, Kentucky Transportation Cabinet, began planning for a replacement bridge on KY 1742 in Casey County, Kentucky (the Project). Initially, the Department elected to close the road and reroute traffic on a thirteen-mile detour rather than construct a temporary diversion bridge near the existing bridge.

Two years later, the Department advertised the Project and requested bids from contractors. Ford submitted a bid of $294,000.00, which was below the engineer's estimate of $364,668.39, and also the lowest bid on the Project. The Department awarded the contract to Ford on March 3, 2006.

When the public learned of the Project, opposition arose. Residents were unhappy with the thirteen-mile detour, and expressed their dissatisfaction to both the Lieutenant Governor's office and the Department's Chief Engineer. Additionally, 170 Casey County residents delivered a petition to the Department opposing the road closure and requesting a diversion bridge. After receiving the petition, the Department's State Highway Engineer again reviewed the Project, but concluded that the use of a detour and road closure was still the best course.

The Department and Ford executed a formal contract on March 31, 2006. The contract called for the Project to be completed within sixty-five (65) working days after the Department's notice to commence work and incorporated by reference the Department's 2004 Standard Specifications for Road and Bridge Construction.

On April 10, 2006, the Department notified Ford that it was to commence the Project no later than May 10, 2006. Prior to that date, Ford initiated preparatory steps to perform the Project, ordering steel and other materials, gathering and readying equipment, installing traffic signs, and performing other preparatory work.

In early May 2006, a local newspaper reported that, despite local objections, the Project would proceed as originally planned. This ignited a fresh wave of public opposition. One resident threatened to contact an attorney and to protest the project site.

On May 9, 2006, the Project Engineer notified Ford that the Project was on indefinite hold, and instructed Ford not to close the road, effectively halting the Project. The Project Engineer also advised Ford that the Department was considering a temporary diversion to appease disgruntled citizens unhappy with the thirteen-mile detour. The Department then developed a diversion plan which called for a temporary bridge structure, able to withstand a twenty-five-year flood, to be constructed immediately adjacent to the existing bridge. The Department instructed Ford to submit a price estimate for the diversion plan.

Ford obtained diversion estimates from two other contractors: one for $346,667.00 and the other for $328,016.00. On May 31, 2006, Ford submitted these two bids along with its own diversion bid of $317,000.00 to the Department. Ford also advised the Department that it could begin work within three weeks of receiving notice to resume work. Had the Department accept-

ed Ford's diversion bid, the total known cost for the Project would have been $611,000.00.[1]

Department officials discussed Ford's diversion estimate and decided this total cost was too high. Accordingly, the Department chose to terminate Ford's contract and re-let the Project to include a diversion.[2] On June 8, 2006, the Commissioner of Highways cancelled the Project "for convenience" pursuant to Kentucky Revised Statutes (KRS) 45A.200(2). On June 10, 2006, the Project Engineer notified Ford by telephone that the contract had been cancelled; Ford requested written notice. On June 13, 2006, the Project Engineer advised Ford by letter that the contract had been cancelled and requested that Ford submit documentation of direct costs incurred on the contract. By letter dated July 3, 2006, the Department provided Ford a copy of the official order of cancellation dated June 26, 2006; Ford received the letter on July 7, 2006. As justification for the cancellation, the order cited public opposition, the decision to utilize a diversion, and the inability to obtain necessary easements and permits.

In September 2006, Ford submitted a claim of $553,100.60 in costs to the Department. The Department denied Ford's claim. The Department offered to pay $16,507.42 as compensable costs. Ford rejected the Department's offer. Following failed negotiations, Ford requested an administrative hearing.

An eight-day administrative hearing was held on nonconsecutive days in December 2007, and January and February 2008. At the hearing, Ford presented its case claiming $518,993.55 in damages resulting from the contract's cancellation. Ford divided its damages into 15 categories:

| | |
|---|---|
| 1. Steel (with $900 credit for scrap) | $ 4,610.61 |
| 2. Bonding | $ 0.00 |
| 3. Labor | $ 15,907.65 |
| 4. Overhead | $ 8,590.59 |
| 5. Superintendent Living Accommodations | $ 1,600.00 |
| 6. Direct, Distributed Costs | $ 22,290.57 |
| 7. Material Storage | $ 4,550.00 |
| 8. Prejudgment Interest [3] | $ 5,366.06 |
| 9. Unabsorbed Overhead | $ 12,395.00 |
| 10. Equipment Depreciation | $ 43,541.64 |
| 11. Stockpiled Materials | $ 4,753.49 |
| 12. Attorney and Expert Witness Fees [4] | $ 6,126.75 |
| 13. Pre–Stress Services | $ 3,043.62 |
| 14. Lost Profit | $ 33,075.00 |
| 15. Idle Equipment | $353,142.57 |
| **Total:** | $518,993.55 |

Cammle Ford, president and owner of Ford, testified in support of Ford's damages claim. Mike Spears, a certified public accountant, also testified to the results of an annual audit of Ford he performed in 2006 and discussed that audit.

1. This is the total cost of $294,000.00 to replace the existing bridge, plus $317,000.00 to construct and remove the temporary diversion bridge.

2. Had the Department accepted Ford's diversion estimate, it would have issued a change order to Ford's existing contract to pay for both the diversion and the original contract.

3. Ford labeled this category "Cost of Money."

4. Ford labeled this category "Claims Presentation Costs."

The Department disputed almost every category of Ford's damages. Charles McGaughey, a certified public accountant, testified on the Department's behalf. McGaughey, relying in part on Spears's 2006 audit, testified at length concerning what he considered the proper calculation of each of Ford's claimed damages. McGaughey concluded Ford incurred: (i) between $776.00 and $3,105.00 in labor costs, depending on the number of hours of work actually completed, which McGaughey estimated to be between 30 and 120; (ii) between $8,811.00 and $10,397.00 in job-related indirect/overhead costs attributable to the Project;[5] and (iii) $1,346.00 in direct costs attributable to the Project. McGaughey explained his indirect/overhead costs calculation included depreciation, equipment costs (such as fuel, maintenance and repairs), and unabsorbed overhead. McGaughey disagreed with the methods by which Ford calculated damages. He also testified that Ford's records indicated it did not incur costs for stockpiled materials or costs for material storage, and found the living-accommodations cost was merely a cost of doing business and was not attributable to the Project. Accordingly, McGaughey opined Ford was not entitled to recover any sums for these categories. McGaughey further testified Ford was not entitled to recover prejudgment interest, or attorney and expert witness fees. McGaughey acknowledged that the Cabinet had admitted Ford was entitled to recover the cost of steel

purchased[6] and pre-stress services performed. Finally, McGaughey testified Ford completed approximately 7% to 9% of the contract, and therefore was entitled to lost profits between $2,356.00 and $3,020.00.

In sum, McGaughey concluded Ford's costs were between $10,933.00 and $14,848.00. Accounting for lost profits, and reimbursement for purchased steel ($4,610.61) and pre-stress services ($3,044.00), McGaughey testified Ford was entitled to recover from the Department between $21,111.61 and $25,522.61.

After hearing the conflicting evidence, the hearing officer found that the Department had not properly terminated the contract for convenience under KRS 45A.200(2).[7] Citing *RAM Engineering & Construction, Inc. v. University of Louisville*, 127 S.W.3d 579 (Ky.2003), the hearing officer reasoned that KRS 45A.015(2)[8] imposed upon the Department a duty of good faith to do "everything necessary to carry out the contract," thereby limiting the Department's discretion to terminate a contract only if a substantial change in circumstances occurs. The hearing officer further found the public opposition that arose in May 2006 did not constitute a "substantial change of circumstances" sufficient to justify the contract's cancellation. The hearing officer emphasized that the Department was well aware of the opposition before it entered into the contract with Ford on March 30, 2006.

5. McGaughey distinguished between indirect/overhead costs which are attributable to a specific contract or project from general administrative/overhead expenses that are not job-specific. Examples of the latter included an office receptionist, office utility bills, paper for the copier, and office supplies.

6. While McGaughey did not assign a value to this category, there seems to be no real dispute that Ford is entitled to $4,610.61 for steel purchased for the Project.

7. KRS 45A.200(2) requires certain construction contracts to include a clause authorizing the Commonwealth to terminate the contract for convenience.

8. KRS 45A.015(2) directs that "[e]very contract or duty under this code shall impose an obligation of good faith in its performance or enforcement."

With respect to damages, the hearing officer applied a "just and equitable" award standard. The hearing officer determined Ford was entitled to lost profits in the amount of $41,825.29 [9]; reimbursement for expenses incurred from pre-stress services in the amount of $3,043.62; and reimbursement for the purchase of steel reinforcement materials in the amount of $4,610.61. For other direct expenses and costs, the hearing office found that "only minor preparation .work and ordering had been done," and rejected Ford's claim that it had performed between 25% and 27% of the contract. Accordingly, the hearing officer awarded Ford $2,517.00 to compensate Ford for its direct expenses.

In sum, the hearing officer recommended payment of $52,001.26.

Following an exhaustive analysis, the hearing officer denied recovery for the remainder of Ford's claimed damages. The hearing officer made three important findings relevant to this appeal.

First, the hearing officer found the testimony of Cammle Ford, and Ford's overall damages claim, to lack credibility. The hearing officer explained:

If the hearing officer were to accept Ford's arguments as to its "costs" . . ., Ford would have lost $224,993.50 to perform the contract if no breach occurred. Ford would only have received $294,000.00 under the contract but has allegedly incurred $518,993.50 in "costs" to partially perform the contract. This result demonstrates the absurdity of Ford's damages claim for $518,993.50.

. . . .

Unfortunately, Ford has so exaggerated its costs and expenses, included impermissible expenses, had to exclude expenses when rightfully questioned by the Department, submitted amended damage claims, failed to produce necessary proof, and so convoluted [its] claim, that the Hearing Officer has had difficulty determining what costs and expenses were actually incurred by Ford on the project. To put it more bluntly, the Hearing Officer does not know where the truth ends and the fiction begins.

Second, the hearing officer reasoned that Ford had the burden to prove by a preponderance of the evidence that it was entitled to a "just and equitable" award of damages that would return Ford to the same position it would have been in had the contract been performed. The hearing officer rejected Ford's remaining costs on the ground that such an award would put Ford in a better position than it would have been had the contract been completed.

Third, the hearing officer rejected Ford's claim that its damages should be assessed under the federal cost principles set forth in 48 Code of Federal Regulations (C.F.R.) Part 31. The hearing officer concluded that the federal cost principles were nothing more than "guidelines" to be used under certain circumstances, including settlements of terminated contracts.

Ford and the Department filed timely exceptions. The Cabinet issued a final order on December 18, 2008, which accepted the Department's exceptions, rejected the hearing officer's improper-termination finding, denied Ford's exceptions, and reduced Ford's damages award from $52,001.26 to $46,490.65 (2008 Final Order).

Ford appealed to the Franklin Circuit Court which, on November 17, 2009, en-

9. The hearing officer reached this amount by subtracting Ford's original list costs of performing the contract ($252,174.71) from the total contract price ($294,000.00).

tered its opinion reversing and remanding the 2008 Final Order. In so doing, however, the circuit court agreed with the Cabinet that the federal cost principles were not "strictly mandatory." Instead, the circuit court reasoned that the principles may be used, at the fact-finder's discretion, as guidelines in ascertaining a just and equitable damages award. On remand, the circuit court directed the Cabinet to determine:

(1). Whether the price of Ford's diversion bid or the additional delay costs constituted a substantial change in circumstances that warranted a proper termination of the contract for convenience; and

(2). A determination of a just and equitable award pursuant to the above finding. The fact finder is not precluded from using the C.F.R. cost principles, but Ford must prove his claims by a preponderance of the evidence, and the resultant award must be "just and equitable."

(R. at 307). In response to Ford's timely Kentucky Rules of Civil Procedure (CR) 59.05 motion, the circuit court issued a subsequent order on May 24, 2010, disqualifying the Cabinet Secretary from deciding the remanded issues because he testified adversely to Ford during the administrative hearing. The Cabinet designated a substitute to serve in the Secretary's place (Secretary's Designee).

On remand, by order entered September 27, 2010, the Secretary's Designee again found Ford's diversion bid and the need to acquire temporary easements, collectively, constituted a substantial change in circumstances justifying termination of the contract (2010 Final Order). The Secretary's Designee further found the hearing officer's damages award of $52,001.26 to be just and equitable, and found it unnecessary to apply the federal cost principles.

Ford took the matter back to the circuit court. By order entered February 21, 2012, the circuit court reversed the 2010 Final Order in part and affirmed in part. The circuit court reversed the Secretary's Designee's conclusion that the Department properly terminated the contract for convenience. The Cabinet has not appealed this portion of the circuit court's order, and it stands. However, the circuit court upheld the Cabinet's damages award of $52,001.26. Ford promptly appealed.

## II. *Standard of Review*

 Ford is correct that judicial review of an administrative decision focuses on arbitrariness. *Kaelin v. City of Louisville,* 643 S.W.2d 590, 591 (Ky.1982). One component of arbitrariness review is "whether determinations are supported by substantial evidentiary support." [10] *Hilltop Basic Resources, Inc. v. County of Boone,* 180 S.W.3d 464, 467 (Ky.2005). Thus, this Court generally confines its review to: (1) whether the findings of fact are supported by substantial evidence of probative value; and (2) whether the administrative agency applied the correct rule of law to the facts. *Board of Com'rs of City of Danville v. Davis,* 238 S.W.3d 132, 135 (Ky.App.2007). While we are bound by the subordinate facts found by the hearing officer, we are not bound by the hearing officer's legal conclusions. *See id.*

 Our review, however, is altered when the agency denies relief to the party saddled with the burden of proof. *Bourbon County Bd. of Adjustment v. Currans,* 873 S.W.2d 836, 838 (Ky.App.1994). In

---

**10.** The other two considerations are: "(1) whether an action was taken in excess of granted powers[; and] (2) whether affected parties were afforded procedural due process[.]" *Hilltop,* 180 S.W.3d at 467. Neither of these is at issue in this case.

such a case, "the failure to grant administrative relief to one carrying the burden is arbitrary [only] if the record compels a contrary decision in light of substantial evidence therein." *Id.*

Not infrequently, contestants appear at the judicial level arguing that the administrative decision is not supported by substantial evidence when the board has offered no relief in the first instance. In other words, the board has ruled that the one having the burden of proof—usually the applicant—has failed. In such cases, attention should be directed to the administrative record in search of compelling evidence demonstrating that the denial of the relief sought was arbitrary. The argument should be that the record compels relief. The argument that there is no substantial evidence to support nonrelief is an anomaly.

*Id.* Evidence is compelling if it is so overwhelming that no reasonable person could fail to reach the same conclusion. *Greene v. Paschall Truck Lines*, 239 S.W.3d 94, 108 (Ky.App.2007) (citation omitted).

■ Furthermore, it is basic hornbook law that the "trier of facts is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses appearing before it." *Bowling v. Natural Resources and Environmental Protection Cabinet*, 891 S.W.2d 406, 409–10 (Ky.App.1994). "To put it simply, 'the trier of facts in an administrative agency may consider all of the evidence and choose the evidence that he believes.'" *Id.* (citation omitted). This Court may not reconsider or "pass upon the credibility of witnesses, and the weight of the evidence" for these functions rest within the "exclusive province of the administrative trier of fact." *Id.*

Finally, statutory interpretation is an issue of law and, accordingly, we review the circuit court's statutory construction *de novo. See Cumberland Valley Contrac-* *tors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky.2007).

## III. *Analysis*

Ford raises three issues: (1) whether the circuit court improperly upheld the hearing officer's damages award; (2) whether the circuit court erroneously denied Ford's request for prejudgment interest; and (3) whether the circuit court improperly rejected Ford's argument that the 2010 Final Order is untimely, null, and void.

### A. *Damages*

■ Contract damages serve to compensate the injured party. In Kentucky, the general "measure of damages for breach of contract is 'that sum which will put the injured party into the same position he would have been in had the contract been performed.'" *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky.1995) (quoting *Perkins Motors, Inc. v. Autotruck Federal Credit Union*, 607 S.W.2d 429, 430 (Ky. App.1980)). This calculation includes compensation for work already performed and expenses incurred, plus loss of profits on the entire contract. *Ellis v. Knight*, 382 S.W.2d 391, 393 (Ky.1964).

■ Contract damages must always be proven with reasonable certainty. *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky.1985). Thus, "uncertain, contingent, and speculative damages" are generally not recoverable. *Spencer v. Woods*, 282 S.W.2d 851, 852 (Ky.1955).

With these principles in mind, we turn to Ford's claims of error.

### (i). **Applicability of the Federal Cost Principles**

■ Ford asserts that KRS 45A.215 mandates use of the federal cost principles contained in 48 C.F.R. Part 31 to calculate

an injured party's damages. Ford argues that they are not "merely guidelines" when there has been no settlement of a contract dispute. Ford further asserts the principles apply to all categories of its damages and, because Ford correlated its damages to the principles, the circuit court's failure to consider them constitutes reversible error.

This argument is premised almost entirely on this Court first finding that the federal cost principles are, in fact, mandatory and, therefore, must be used to calculate Ford's damages. For the reasons set forth below, we decline to so rule.

KRS 45A.215 directed the secretary of the Finance and Administration Cabinet to issue regulations "setting forth cost principles which shall be used:"

> (1) As guidelines in the negotiation of:
>> (a) Estimated costs or fixed prices when the absence of open market competition precludes the use of competitive sealed bidding;
>> (b) Adjustments for state-directed changes or modifications in contract performance; and
>> (c) Settlements of contracts which have been terminated.
> (2) To determine the allowability of incurred costs for the purpose of reimbursing costs under contract provisions which provide for the reimbursement of costs; and
> (3) As appropriate in any other situation where the determination of the estimated or the incurred costs of performing contracts may be required.

KRS 45A.215. Pursuant to KRS 45A.215, the Finance and Administration Cabinet promulgated 200 Kentucky Administrative Regulations (KAR) 5:317, which adopted the cost principles set forth in 48 C.F.R. Part 31 to satisfy "the purposes stated in KRS 45A.215." 200 KAR 5:317 Section 3. Notably, Section 1 of that regulation directs that only "[c]ost reimbursement con-

tracts shall conform to the cost principles set forth in 48 C.F.R. Part 31[.]" 200 KAR 5:317, Section 1.

"All statutes ... shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]" KRS 446.080. In construing a statutory provision, we must "look to the letter and spirit of the statute, viewing it as a whole." *Lewis v. Jackson Energy Co-op. Corp.,* 189 S.W.3d 87, 93 (Ky.2005) (citation omitted). Our goal is to construe a statute so that no part of its provisions is rendered meaningless and ineffectual. *Hardin County Fiscal Court v. Hardin County Bd. of Health,* 899 S.W.2d 859, 861–62 (Ky.App.1995).

The Cabinet and, in turn, the circuit court, relied on KRS 45A.215(1)(c) to conclude that the federal cost principles were only to be used as guidelines. Ford claims this was error. We are in technical agreement with Ford.

KRS 45A.215(1)(c) authorizes the discretionary use of the federal cost principles as mere "guidelines" in the *settlement* of terminated contracts. Here, Ford sought administrative intervention because settlement negotiations had failed. The pursuit of administrative relief under KRS Chapter 13B is unquestionably adversarial, not mediatorial. *See* KRS 13B.080.

However, we do not agree with Ford that use of federal cost principles is mandatory. KRS 45A.215 directs the compulsory application of federal cost principles in two instances only under subsections (2) and (3). In the first, federal cost principles are to be used "[t]o determine the allowability of incurred costs for the purpose of reimbursing costs under contract provisions which provide for the reimbursement of costs[.]" KRS 45A.215(2). This section of the statute refers to a specific type of contract: cost-reimbursement contracts. *See* 200 KAR 5:317 Sec-

tion 1, 3; KRS 45A.070(2). A cost-reimbursement contract explicitly provides for the reimbursement of the contractor's actual costs plus a fixed fee, if any. KRS 45A.130; KRS 45A.070(2). Notably, a cost-reimbursement contract reimburses only those contract costs "which are allowable and allocable in accordance with the cost principles as provided in KRS 45A.215[.]" KRS 45A.070(2). The contract in question is a fixed-price contract, not a cost-reimbursement contract. Therefore, this provision of the statute is inapplicable and will not support a holding that the federal cost principles must apply here.

In the second instance, federal cost principles are to be applied "in any other situation where the determination of the estimated or the incurred costs of performing contracts may be required." KRS 45A.215(3). However, the legislature qualifies this application by stating that the regulations issued by the Cabinet, incorporating the federal cost principles, "shall be used [in these other situations, a]s appropriate[.]" KRS 45A.215(3). Again, construing the statute so that no one part is rendered meaningless, *Hardin County Fiscal Court*, 899 S.W.2d at 861–62, we must give meaning to the phrase "as appropriate."

The question, then, is when is it appropriate for our courts to deviate from our long-developed jurisprudence for determining breach-of-contract damages by applying federal cost principles. We have been directed to no authority, and offered no rationale for jettisoning this jurisprudence, in favor of federal guidelines designed, initially at least, for a different purpose. Application of the federal cost principles is only appropriate when these time-tested measures, when properly applied, fail to make the non-breaching party whole. That is not this case.

Notably, the hearing officer found that Ford's estimated costs for fully performing the contract were $224,993.50, yet application of the federal costs principles would have yielded an award of $518,993.50. Considering Ford only partially performed the contract, such an award could only be considered punitive of the Cabinet or a windfall to Ford. We agree with the hearing officer that application of the federal costs principles is neither mandatory nor appropriate in this case.

The hearing officer found that Ford was entitled to a "just and equitable" award that would put Ford in the same position it would have been had the contract been performed. *Hogan*, 922 S.W.2d at 371; 200 KAR 5:312, Section 3(3); 2004 Standard Specifications, Section 108.12. This was the proper measure of damages. On this issue, we find no error.

**(ii). Equipment–Related Damages**

Ford next argues its idle equipment costs are compensable, and that the circuit court erred in upholding the Cabinet's order concluding that they were not. We agree with Ford.

Ford alleges that the Department's indefinite hold on the Project left Ford in limbo, and forced its equipment into a varied and indefinite standstill from May 9, 2006, until receipt of the Department's cancellation order on July 7, 2006. Ford claims it is entitled to compensation of $314,109.90 as damages caused by the delay and the need for Ford to keep its equipment idle but on-site, prepared to begin performance upon the Department's notification.

Ford has not identified, and we have not found, Kentucky law recognizing idle equipment or delay damages as a compensable category of damages. It appears to be a matter of first impression. A survey of foreign jurisdictions and relevant secondary literature suggests such damages are often compensable. *R.L. Coolsaet*

**410**

*Const. Co. v. Local 150, Intern. Union of Operating Engineers,* 177 F.3d 648, 660 (7th Cir.1999) (also citing cases from the 9th, 10th, and 11th appellate circuits); *W.G. Cornell Co. of Washington, D.C. v. Ceramic Coating Co., Inc.,* 626 F.2d 990, 994 (D.C.Cir.1980); *In Re U.A. Anderson Const. Co.,* ASBCA No. 48087, 99–1 B.C.A. (CCH) ¶ 30347, 1999 WL 259491 (Apr. 27, 1999); *White Oak Corporation v. Dep't of Transp.,* 217 Conn. 281, 585 A.2d 1199, 1205–06 (1991); *Arcon Constr. Co., Inc. v. South Dakota Cement Plant,* 349 N.W.2d 407, 408–15 (S.D.1984); Bramble & Callahan, *Construction Delay Claims* § 12.07 (2013); Kelleher, Corgan & Dorris, *Construction Disputes: Practice Guide with Forms* § 9.09 (2012); Schwartzkopf & McNamara, *Calculating Construction Damages* § 3.02 (2nd ed.2001).

■ As explained by the Seventh Appellate Circuit, "idle equipment (or equipment which must remain on a job site because the project is delayed) is a real and quantifiable loss to the contractor, whether rent is paid to another or charged to the contractor himself as an accounting expense, and it is recoverable." *R.L. Coolsaet Const. Co.,* 177 F.3d at 660 (footnote omitted); Robert F. Cushman, et al., *Proving & Pricing Construction Claims* § 219 (2012) ("When a project delay attributable to the owner idles the contractor's construction equipment, the contractor is entitled to compensation for costs incurred while the equipment was idle."). We find this reasoning persuasive. More importantly, it comports with Kentucky law.

■ It was long the practice in this Commonwealth to include in a contract a "no-damages-for-delay" clause. Kentucky courts adjudged such clauses enforceable. *See Humphreys v. J.B. Michael & Co.,* 341 S.W.2d 229 (Ky.1960) *overruled on other grounds by Foley Construction Co. v. Ward,* 375 S.W.2d 392 (Ky.1963); *Apex Contracting, Inc. v. City of Paris,* 2004 WL 758276 (Ky.App. Apr. 9, 2004)(2002–CA–001310–MR). However, in 2007, the Kentucky legislature enacted the Kentucky Fairness in Construction Act, which declared as "against the public policy of this Commonwealth[,]" and therefore "void and unenforceable[,]" a contract provision "that purports to waive, release, or extinguish the right of a contractor or subcontractor to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are, in whole or part, within the control of the contracting entity." KRS 371.405(2)(c). If a party is prohibited from contracting away delay damages, it stands to reason such damages are recoverable in appropriate situations. Accordingly, we hold that equipment rendered idle by a delay attributable to the owner who is determined to have breached the contract is a proper element of damages.

■ In finding Ford was not entitled to idle equipment damages, the hearing officer noted that, if the contract had been completed, Ford would have used the equipment and not received any compensation relating to that equipment. Thus, "[t]he award for lost profits contemplates that Ford would have used the equipment to earn those profits until at least July 7, 2006, so that an award for any additional use, rent, idleness, etc. of that equipment would improperly place Ford in a better position than if the contract had been completed." (R. at 75).

■ The hearing officer found the award of lost profits adequately compensated Ford for its idle equipment costs. We disagree. Had the contract been performed, Ford would have recovered its equipment costs in addition to its profit. Ford should not be burdened with costs it incurred due to the Department's malfeasance. Again, when a contract is breach-

ed, the non-breaching party is entitled to lost profits, plus compensation for work already performed and expenses incurred. *See Ellis,* 382 S.W.2d at 393. The Department chose to place the Project on indefinite hold. Unsure when the Department would recall Ford to the Project, Ford was unable to allocate its equipment to other contracts or projects. Its equipment sat idle.[11] Thus, the Department was responsible for the delay resulting in Ford's equipment being idle. Ford should not be obligated to absorb costs which it included in the calculation of its winning bid, and which costs were expended wastefully because of the actions of the Department. Such costs are damages compensable as a separate category of damage from lost profits.

On this issue, we remand. We instruct the circuit court to remit this matter to the Cabinet for additional findings, if needed,[12] and for the Cabinet to award Ford reasonable idle equipment damages. In so doing, we offer the following guidance.

 First, Ford is only entitled to compensation for the delay period attributable to the Department. *See* Cushman, *supra,* § 219 (explaining idle equipment damages are compensable "for a project delay attributable to the owner"). Here, Ford's equipment was rendered idle on May 9, 2006, when the Department issued its indefinite hold. On June 10, 2006, the Project Engineer notified Ford that the contract had been cancelled. In our view, the hold was lifted at this time; Ford had sufficient notice that it no longer needed to dedicate equipment to the Project, and no

longer needed to maintain a minimal level of readiness. Accordingly, Ford is only entitled to idle equipment damages for those working days between May 9, 2006, and June 10, 2006.

 Second, Ford bears the burden of establishing both: (1) that the equipment claimed was, in fact, actually idle during the delay period; and (2) that the "[e]quipment was necessary for completion of the contract work[.]" Schwartzkopf, *supra,* § 3.02. It is certainly conceivable that not all of Ford's equipment was rendered idle. Likewise, it is possible the equipment rendered idle did not remain so for the duration of the delay period. As a corollary, we note that Ford was also obligated to mitigate its damages. *Morgan v. Scott,* 291 S.W.3d 622, 640 (Ky.2009) ("Under Kentucky law, a party is required to mitigate his or her damages." (Footnote omitted)). Once Ford has shown the equipment was actually idle and indispensable to the Project, the burden shifts to the Cabinet to establish that Ford failed to mitigate its damages.

 Third, we find the proper measure of damages when equipment is idled to be the equipment's actual rental value (if rented or leased), or the non-breaching party's actual cost to own the equipment. *See Arcon Const. Co.,* 349 N.W.2d at 414; Bramble, *supra,* § 12.07 ("[C]harges for idle rented or leased equipment are usually calculated by demonstrating the actual charge for rented or leased equipment for the extended period.") Only absent such rate information may a rental guidebook [13]

---

**11.** Indeed, the hearing officer made a specific factual finding that Ford's "equipment remained idle and was dedicated to the project while Ford waited for the Cabinet's decision." (R. at 64).

**12.** The Cabinet may, at its discretion, again utilize the services of a hearing officer to ascertain any additional needed facts.

**13.** Common rental guidebooks include the Equipment Watch and Rental Rate Blue Book, and the Green Guide published by the Associated Equipment Distributors.

be used as a *guide* to determine damages. *See Arcon Const. Co.*, 349 N.W.2d at 414. As always, the trier of fact must exercise caution to ensure a rental guidebook rate does not result in an absurd or unreasonable damages award. For example, the South Dakota Supreme Court concluded that a rental guidebook rate "which is ten times the amount of the figure the contractor used in his bid [was] unreasonable."[14] *Id.*

■ Fourth, Ford's gross idle equipment damages must be reduced by "50 percent to reflect lack of wear and tear." *White Oak Corp.*, 585 A.2d at 1206 (explaining "a 50 percent reduction is the standard method used"); *W.G. Cornell*, 626 F.2d at 994 ("[T]he fair rental value of equipment rendered idle by delays ... has consistently been reduced by fifty percent to compensate for the absence of wear and tear."). Here, Ford does not dispute that its equipment was spared wear and tear, and does not dispute that a fifty-percent reduction is warranted.

■ Ford's equipment-damages claim includes a second component in the claimed amount of $39,032.67. Ford claims it incurred this amount "in operating costs based on Ford's inability to earn revenue to compensate for equipment usage during the lag between bid time and the hold." (Appellant's Brief at 10). Ford is not entitled to reimbursement for these costs. The contract contained no specified start date. Instead, the contract directed the Department to notify Ford, in writing, when it was to commence the contract work. While certainly inconvenient to Ford, Ford was well aware of this contract provision when it signed the contract. We cannot say the "lag" between the bid and start date is a delay attributable to the

Cabinet for which Ford should receive idle equipment compensation.

### (ii). Substantial Evidence

Ford's final damages-related argument is simply that its damages were supported by the evidence, and the circuit court erroneously affirmed the Cabinet's decision not to find in Ford's favor as to all its claimed damages. This argument is unpersuasive.

First, several categories of Ford's damages hinged on the testimony of Cammle Ford, which the hearing officer found to be less than credible. In light of this, the hearing officer was certainly permitted to discount or even disregard Cammle Ford's testimony. *Bowling*, 891 S.W.2d at 409–10 ("[T]he trier of facts in an administrative agency may consider all of the evidence and choose the evidence that he believes." (Internal quotation marks and citation omitted)).

Second, Ford's damages evidence was countered in almost every respect by McGaughey, the Cabinet's expert witness. Ford attacks McGaughey's credibility, describing his testimony as inaccurate and the hearing officer's reliance thereon erroneous. McGaughey was certainly qualified, however, to testify to the costs incurred by Ford. He testified in detail concerning the methods by which he calculated Ford's supposed damages, and was subject to rigorous cross-examination. The incongruity between Ford's calculations and McGaughey's calculations did not render erroneous the hearing officer's reliance upon McGaughey's testimony. Ultimately, the hearing officer was faced with conflicting testimony, and had to choose one version as preferable to the other. When the testimony is conflicting, we will not substitute our decision for

---

**14.** That particular question is not before this Court. Even if that were an actual controversy requiring our attention, we would neces-

sarily consider all of the circumstances of the case.

that of the trier of fact. *R.C.R. v. Commonwealth, Cabinet for Human Resources*, 988 S.W.2d 36 (Ky.App.1998).

Neither Ford nor the Cabinet takes issue with the damages awarded for lost profits, purchased steel, and pre-stress services. Similarly, while Ford initially included bonding costs as a category of damages, it abandoned that claim before the hearing officer. No further discussion of these damages is warranted.

We direct our attention to Ford's direct, indirect, and labor costs. Cammle Ford testified Ford incurred $22,290.57 in direct and indirect costs,[15] and $15,907.00 in labor costs, for a total of $38,197.57. McGaughey testified Ford's direct costs were $1,346.00, its indirect costs were $8,811.00, and its labor costs were between $776.00 and $3,000.00. In sum, McGaughey opined that Ford's total direct, indirect, and labor costs ranged between $10,933.00 and $13,157.00.

The hearing officer awarded Ford a total of $2,517.00 for its direct and indirect costs, and labor expenses.[16] In so doing, the hearing officer declared Ford's labor claim unreasonable because only minor preparation work had been done on the Project.[17] The hearing officer found Cammle Ford's labor-costs testimony particularly incredible. Similarly, the hearing officer struggled to make sense of Ford's "exaggerated" and "convoluted" direct and indirect costs testimony. To cut through the haze, the hearing officer awarded Ford 1% of its total estimated costs to perform the contract, $252,175.71.

While we certainly sympathize with the hearing officer's plight in calculating these costs, his $2,517.00 award does not comport with the evidence presented during the hearing, and is therefore not supported by substantial evidence. With respect to these damages, we reverse. On remand, we direct the circuit court to instruct the Cabinet to award Ford direct, indirect, and labor costs in an amount consistent with the evidence presented, taking into consideration the hearing officer's prior credibility determinations.

With respect to employee living accommodations, material storage, equipment depreciation, stockpiled materials, attorney and expert witness fees, overhead, and unabsorbed overhead, the hearing officer determined Ford failed to provide any reliable evidence as to the appropriate amount of such damages. Simply put, Ford failed to carry its burden of proof. Moreover, McGaughey, for various reasons, assigned a zero damages rating to each of these categories. We have painstakingly reviewed the record, and cannot say it "compels a contrary decision in light of substantial evidence therein." *Currans*, 873 S.W.2d at 838. Accordingly, we decline to disturb the hearing officer's decision as to these categories of damage.

### B. Prejudgment Interest

Ford asserts the circuit court's erroneous denial of its request for prejudgment interest constitutes reversible error. Ford argues its claim for breach of contract is a liquidated claim, entitling it to prejudgment interest. In response, the Cabinet argues that the claim is unliquidated.

---

15. While labeled "direct and distributed costs," the hearing officer noted in its opinion that this category included direct and "indirect costs allocated to the project" (R. at 60).

16. The hearing officer stated its direct-costs award included labor costs. (R. at 80–81).

17. Again, the hearing officer pointed out that Ford's $15,907.60 labor claim was almost one-half of the total $30,973.00 labor costs for the entire project.

 We begin with the principle that "equity and justice demand that one who uses money or property of another" should generally pay for its use. *Curtis v. Campbell*, 336 S.W.2d 355, 361 (Ky.1960) (citation omitted). Indeed, equity and justice serve as the foundation upon which an award of prejudgment interest rests. *Church & Mullins Corp. v. Bethlehem Minerals Co.*, 887 S.W.2d 321, 325 (Ky. 1992). An award of prejudgment interest "is a determination to be made by the trial court [or in the case of an administrative hearing, by the ALJ, if such interest is permissible under the law] and to be disturbed by an appellate court only upon a showing of an abuse of discretion." *Id.*

 "[P]rejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands." *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer District*, 174 S.W.3d 440, 450 (Ky.2005); *Nucor Corp. v. General Elec. Co.*, 812 S.W.2d 136, 141 (Ky.1991). Whether damages qualify as liquidated or unliquidated, however, is not always clear.

 A damages claim is liquidated if it is "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *3D Enterprises*, 174 S.W.3d at 450 (citation omitted). Examples include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price." *Nucor Corp. v. General Elec. Co.*, 812 S.W.2d at 141. In contrast, an unliquidated damages claim is one which has "not been determined or calculated, . . . not yet reduced to a certainty in respect to amount." *Id.* (citations omitted).

An unliquidated claim is unspecified and undetermined prior to a breach. In determining whether a claim is liquidated or unliquidated, "one must look at the nature of the underlying *claim*, not the final award." *3D Enterprises*, 174 S.W.3d at 450.

 Here, the value of Ford's underlying breach of contract claim was neither "agreed upon by the parties [nor] fixed by operation of law or the parties." *Nucor Corp.*, 812 S.W.2d at 141. This is not a simple matter of determinable damages resulting from "an unpaid fixed contract price" or the failure "to render a performance with fixed or ascertainable monetary value." *Id.* At the time of the breach, the amount due Ford was far from definite or certain; it was not fixed in amount, and could not have been predicted with any amount of certainty. At all times in this litigation the parties have vigorously disputed the amount owed Ford. The propriety of the contract's cancellation notwithstanding, the central issue triggering this action was the quantity and value of services Ford provided the Cabinet prior to the contract's cancellation. The contract does not contain a certain computation that could be used to readily ascertain such values. Indeed, it has taken an eight-day administrative hearing and two appeals to the circuit court to yield a damages amount. *See Jackson v. Tullar*, 285 S.W.3d 290, 299 (Ky.App.2007) ("[D]amages that were established by proof offered during the trial are unliquidated and not subject to prejudgment interest."). Ford's damages claim is unliquidated.

 Because Ford's damages are not liquidated, prejudgment interest is a matter of discretion. "When the amount [of damages] is 'unliquidated,' the amount of prejudgment interest, if any, is a matter for the trial court weighing the equitable considerations." *University of Louisville*

*v. RAM Engineering & Const., Inc.,* 199 S.W.3d 746, 748 (Ky.App.2005). In exercising its discretion, the trial court may consider "all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." *Nucor Corp.,* 812 S.W.2d at 144 (citation omitted).

Here, the hearing officer exercised his discretion and found, as a whole, the equities did not warrant an award of prejudgment interest to Ford. The hearing officer reasoned that "[a]ny delay in payment of Ford's claim is mainly the result of Ford's unreasonable claim for $553,100.60 which the Department properly refused to pay resulting in this administrative action." The Cabinet adopted the hearing officer's findings. On appeal, the circuit court found "that the Cabinet was justified in its denial of a pre-judgment interest award to Ford." We decline to disturb the circuit court's decision. On this issue, we find no abuse of discretion.

### C. Validity of the 2010 Final Order

 Finally, Ford urges us to declare the 2010 Final Order untimely and, therefore, null and void. Ford asserts the Secretary's Designee was required to issue her order following remand within the 90–day limit fixed by KRS 13B.120(4). We disagree.

KRS 13B.120(4) directs the agency head to "render a final order in an administrative hearing within ninety (90) days after":

(a) The receipt of the official record of the hearing in which there was no hearing officer submitting a recommended order under KRS 13B.110; or

(b) The hearing officer submits a recommended order to the agency head, unless the matter is remanded to the hearing officer for further proceedings.

KRS 13B.120(4). KRS 13B.120 places no limitation on the agency head to issue a final order within ninety days, or any other

designated timeframe, following remand from the circuit court. Regarding this particular situation, KRS Chapter 13B is silent. Of course, nothing prohibits the circuit court from directing an administrative agency to act upon remand within a practical, defined time period to uphold and further the rationale of KRS Chapter 13B. *See McKinstry v. Wells,* 548 S.W.2d 169, 175 (Ky.App.1977) ("In order that the parties may receive a final resolution of this matter, the circuit court may impose a reasonable time limit within which the [administrative agency] must act.").

We agree that an agency head should act as expeditiously as practicable on remand, taking into consideration the complexities of the case and the issues to be decided. *See generally United Sign, Ltd. v. Commonwealth,* 44 S.W.3d 794, 800 (Ky. App.2000) (explaining the "administrative remedies" contained in KRS Chapter 13B "serve the salutary purposes of" resolving matters "more expeditiously than circuit court actions"). Here, the Secretary's Designee issued the 2010 Final Order on September 27, 2010—126 days after the circuit court's May 24, 2010 order. Under the specific facts of this case, we cannot say the Secretary's Designee was in any way dilatory or remiss in her actions. Accordingly, we decline to declare as untimely or otherwise disturb the Cabinet's 2010 Final Order.

### IV. Conclusion

The February 21, 2012 Opinion and Order of the Franklin Circuit Court is reversed insofar as the court mistakenly upheld the Cabinet's denial of Ford's idle equipment damages and direct/indirect/labor costs damages claim. Solely on these issues, we remand for additional proceedings consistent with the guidelines expressed in this opinion. In all other

respects, the circuit court's opinion and order is affirmed.

ALL CONCUR.